IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
No. 24-1099

———————————————————

DONALD NICODEMUS

Plaintiff-Appellant,

v.

CITY OF SOUTH BEND, INDIANA

Defendant-Appellee

and

STATE OF INDIANA,

Intervenor/Defendant-Appellee

———————————————————

On Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division
No. 3:23-cv-00744-DRL-MGG
The Honorable Damon R. Leichty, Judge

**BRIEF AND SHORT APPENDIX OF APPELLANT**

———————————————

Kenneth J. Falk
*Counsel of Record*
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
kfalk@aclu-in.org

Attorneys for Appellant

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1099

Short Caption: Nicodemus v. City of South Bend

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Donald Nicodemus

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and
   N/A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
   N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: s/ Kenneth J. Falk            Date: 1/23/2024

Attorney's Printed Name: Kenneth J. Falk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]    **No** [ ]

Address: 1031 E. Washington St.

Indianapolis, IN 46202

Phone Number: 317-635-4059            Fax Number: 317-635-4105

E-Mail Address: kfalk@aclu-in.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1099

Short Caption: Nicodemus v. City of South Bend

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Donald Nicodemus

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ Gavin M. Rose    Date: 1/23/2024

Attorney's Printed Name: Gavin M. Rose

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 1031 E. Washington St.

    Indianapolis, IN 46202

Phone Number: 317-635-4059    Fax Number: 317-635-4105

E-Mail Address: grose@aclu-in.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1099

Short Caption: Nicodemus v. City of South Bend

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Donald Nicodemus

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Stevie J. Pactor    Date: 1/23/2024

Attorney's Printed Name: Stevie J. Pactor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [ ] **No** [✓]

Address: 1031 E. Washington St.

Indianapolis, IN 46202

Phone Number: 317-635-4059    Fax Number: 317-635-4105

E-Mail Address: spactor@aclu-in.org

# Table of Contents

Table of Authorities .................................................................. iii

Jurisdictional Statement .......................................................... 1

Statement of the Issues ............................................................ 1

Statement of the Case .............................................................. 2

    I.      Statement of the facts ................................................. 2

          A.     The challenged statute .................................. 2

          B.     Donald Nicodemus and the use of the challenged statute by South Bend................................................. 2

                1.     Mr. Nicodemus is a citizen-journalist who frequently records the South Bend police ............................. 2

                2.     Application of the statute against Mr. Nicodemus in July of 2023 ........................................... 4

                3.     The experience of another citizen-journalist in South Bend........................................................ 5

                4.     Mr. Nicodemus wishes to continue to film South Bend police activity from closer than 25 feet as long as he does not interfere with the police ........................ 6

    II.     Procedural history ..................................................... 7

Summary of the Argument.......................................................... 9

Argument ................................................................................ 12

    I.      Standard of review .................................................... 12

    II.     The First Amendment protects the right of persons to record law enforcement and this necessarily requires that they be allowed to stand close enough to meaningfully observe and record............ 12

    III.    Indiana Code § 35-44.1-2-14 violates the First Amendment because it vests unbridled discretion in law enforcement officers to determine

if activity protected by the First Amendment can occur .......... 14

    A.    The statute is a direct, not incidental, burden on activity
    Protected by the First Amendment ............................... 15

    B.    Indiana Code § 35-44.1-2-14 is unconstitutional as it vests
    unbridled discretion in law enforcement to determine if
    expressive activity may occur ....................................... 21

        1.    The content-neutrality requirement imposed on the
        regulation of expressive conduct is violated if there
        are no standards that constrain the action of the
        government ........................................................... 21

        2.    Indiana Code § 35-44.1-2-14 is unconstitutional as it
        vests unbridled discretion in law enforcement
        officers ................................................................ 22

IV.    The statute fails the intermediate scrutiny imposed on an
enactment that only has an incidental burden on expressive
conduct ...................................................................... 26

    A.    The requirements for intermediate scrutiny ............... 26

    B.    The statute fails the narrow tailoring requirement as its
    burden on First Amendment expression is much greater
    than is necessary to further the government's legitimate
    interests ......................................................... 28

    C.    The challenged statute does not leave open ample
    alternative channels of communication ......................... 30

Conclusion ................................................................ 32

Certificate of Compliance ............................................... 33

Short Appendix ............................................................ S.A. 1

    Judgment in a Civil Action—Dkt. 37 (Jan. 12, 2024) ........................ S.A. 1

    Opinion and Order—Dkt. 36 (Jan. 12, 2024) ...................... S.A. 2

    Statement of compliance with Circuit Rule 30(d) .......................... S.A. 17

[ii]

# Table of Authorities

C<span>ASES</span>:

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023)................................................. 18

*3M v. Pribyl*, 259 F.3d 587 (7th Cir. 2001)......................................................... 12

*ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)...................................... *passim*

*Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102 (D. Ariz. 2022)... 14, 19

*Board of Airport Comr's of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) ................................................................................................................ 11, 24

*Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003)............................ 27

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023)........................................................ *passim*

*City of Houston v. Hill*, 482 U.S. 451 (1987)........................................................ *passim*

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) .......... 10, 22, 24

*DeBoer v. Village of Oak Park*, 267 F.3d 558 (7th Cir. 2001) ........................................ 25

*Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694 (7th Cir. 2013) ................ 30

*Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017) .......................................... 13

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)........................................... 32

*Forsyth Co. v. Nationalist Movement*, 505 U.S. 123 (1992)............................................ 21

*Frisby v. Schultz*, 487 U.S. 474 (1988) ........................................................................ 28

*GEFT Outdoor, LLC v. Monroe County, Indiana*, 62 F. 4th 321 (7th Cir. 2023)..................... 22

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011).................................................... 9, 13, 19, 29

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000) ........................................................ 30

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)................................................. 16

*Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020).......... 13

*Jordan v. Jenkins*, 73 F.4th 1162 (10th Cir. 2023) ....................................................... 14

*McDonald v. City of Chicago*, 243 F.3d 1021 (7th Cir. 2001) ........................................ 25

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018) .......................................... 22, 23

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) .............................................. 25

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)....................... 21

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................ 25

*Riley v. Nat's Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988)................................ 20

*Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357 (1997) ............ 11, 19, 31

*Smith v. Executive Dir. of Ind. War Memorials Com'n*, 742 F.3d 282 (7th Cir. 2014) .................................................................................................................................. 10, 21

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) ........................................................... 16

*Southworth v. Bd. of Regents of the Univ. of Wis. System*, 307 F.3d 566 (7th Cir. 2002) .......................................................................................................................................... 21

*Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) ................................................. 21, 23

*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994)............... 11, 26, 28, 29

*United States v. O'Brien*, 391 U.S. 367 (1968) ....................................................... 11, 26, 27

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................................. *passim*

*Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002) ......................................... 30

S<span>TATUTES</span>:

    *United States Code:*

28 U.S.C. § 1291 ............................................................................................................ 1

28 U.S.C. § 1331 ............................................................................................................ 1

    *Indiana Code:*

Indiana Code § 35-44.1-2-14 ................................................................................. *passim*

Indiana Code § 35-44.1-3-1 ............................................................................... 10, 18, 29

Indiana Code § 35-44.1-4-1.5 ...................................................................................... 18

Indiana Code § 35-44.1-4-2 .................................................................................... 18, 29

Indiana Code § 35-44.1-4-5 .................................................................................... 10, 18


O<span>THER</span> A<span>UTHORITIES</span>:

Joe Hernandez, NPR, *Read this Powerful Statement from Darnella Frazier, Who Filmed George Floyd's Murder*, May 26, 2021, at https://www.npr.org/2021/05/26/1000475344/read-this-powerful-statement-from-darnella-frazier-who-filmed-george-floyds-murd      (last visited Feb. 26, 2024) ....................................................................................................... 19

Joseph Goldstein and Nate Schwerber, T<span>HE</span> N<span>EW</span> Y<span>ORK</span> T<span>IMES</span>, July 18, 2014, https://www.nytimes.com/2014/07/19/Nyregion (last visited Feb. 29, 2024) ............... 19

## Jurisdictional Statement

The district court had original jurisdiction of this case pursuant to 28 U.S.C. § 1331. The district court's federal-question jurisdiction was based on an alleged violation of the First Amendment by defendant.

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 since this is an appeal following the Final Judgment of the district court entered on January 12, 2024 (Short Appendix ["S.A."] at 1), and the district court's Opinion and Order (S.A. at 2), also entered on January 12, 2024. No motion for a new trial or for alteration of the judgment or any other motion that tolls the time within which to appeal was filed in this matter. The Notice of Appeal was filed on January 22, 2024. This is not an appeal from a decision of a magistrate judge and no party to this proceeding appears in their official capacity. There are no prior or related appellate proceedings.

## Statement of the Issues

Indiana Code § 35-44.1-2-14 (eff. July 1, 2023), allows a law enforcement officer "lawfully engaged" in their "duties" to order persons not to approach within 25 feet of the officer. Failure to comply with the officer's demand is a crime. *Id.* The statute contains no standards as to when such an order may be given. Instead, the officer is given unlimited and unbridled discretion to move all persons away, including those who wish to observe and record police activity in circumstances when doing so will not cause any interference with the police. The statute was applied against plaintiff, a citizen-journalist who wishes to continue to closely observe and record police

activity in South Bend when doing so will not interfere with police activities, and who is justifiably concerned that the statute will be enforced against him again.

The issues presented are whether the district court erred in upholding the constitutionality of the statute as the statute violates the First Amendment since:

a.      it affords unbridled discretion to law enforcement to decide whether or not activity protected by the First Amendment may take place and is therefore not content neutral.

b.      even if it were to be deemed to be content neutral and only incidentally burden First Amendment conduct, it is not narrowly tailored and fails to leave open ample alternative channels of communication.

## Statement of the Case

I.      Statement of the facts

A.      The challenged statute

Indiana Code § 35-44.1-2-14 provides, in its entirety:

A person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching commits unlawful encroachment on an investigation, a Class C misdemeanor.

B.      Donald Nicodemus and the use of the challenged statute by South Bend

1.      Mr. Nicodemus is a citizen-journalist who frequently records the South Bend police

Donald Nicodemus is a citizen-journalist residing in South Bend, Indiana. (Declaration of Donald Nicodemus ["Nicodemus Dec."], District Court Docket ["Dkt."] 20-1 at 1 ¶¶ 1-2). As a citizen-journalist, he has for a number of years recorded police

activity, primarily in South Bend, but also in nearby communities. (*Id.* at 1 ¶ 3). He makes these recordings so that the public are able to see newsworthy activities and gain an understanding of what law enforcement is doing. (*Id.* at 1 ¶ 4). He also hopes that to the extent that the recordings capture inappropriate or problematic law enforcement behavior, shining a light on it will help to end it. (*Id.* at 1 ¶ 5). He posts his recordings on his YouTube channel, which has more than 23,000 subscribers. (*Id.* at 1 ¶ 6). His YouTube channel contains the text of the First Amendment and states that "[t]his channel is about exercising my God Given rights as an American . . . [f]ilming police activity and news worthy situations in South Bend Indiana and surrounding areas." (*Id.* at 2 ¶ 7). In addition to posting videos of police activity, he also live streams video to the channel and archives those recordings. (*Id.* at 2 ¶¶ 8-9).

Mr. Nicodemus's recording activities take place on public sidewalks, streets, and parks. (*Id.* at 2 ¶ 10). When he observes and records law enforcement activity, he is careful not to interfere. (*Id.*). Although he does not hinder the police, he will at times situate himself closer than 25 feet from the officers so he is able to both see and hear them and so he is able to create video recordings that are discernable to those who will view them. (*Id.* at 2 ¶11). Depending on the circumstances, if he is farther than 25 feet away it is often difficult if not impossible to hear and see what is happening, and to allow his recording devices to capture the specifics of what is occurring. (*Id.*).

2.    Application of the statute against Mr. Nicodemus in July of 2023

After midnight in late July of 2023, Mr. Nicodemus learned that there was police activity after shots had been fired near an intersection in South Bend. (*Id.* at 2 ¶¶ 12-13). He travelled to the scene where there were a number of South Bend police officers and police vehicles, although there was no active shooting or any other unlawful activity occurring at the time. (*Id.* at 3 ¶¶ 15-17). Across the street from where Mr. Nicodemus was located there was an officer who seemed to be marking where bullet casings had been found. (*Id.* at 3 ¶¶ 17, 19). Presumably, this was the location from where the shots had been fired. (*Id.* at 3 ¶ 18). Mr. Nicodemus situated himself on a sidewalk diagonally across the street from where the officer was marking the bullet casings. (*Id.* at 3 ¶ 19). This was much farther than 25 feet away. (*Id.* at 3 ¶ 20).

From his vantage point on the sidewalk across the street from the activity, Mr. Nicodemus began to live stream the event to his YouTube channel. (*Id.* at 3 ¶¶ 20, 22). He was not interfering with the police or with their investigation in any way. (*Id.* at 3 ¶ 24). After he was filming for a few minutes, a South Bend police officer crossed the street through which a car had just passed, and ordered Mr. Nicodemus and others who had gathered to move back. (*Id.* at 3-4 ¶¶ 24-25). The officer walked off 25 feet from where Mr. Nicodemus and others had gathered and ordered that they had to stay behind the 25 foot mark established by the officer. (*Id.*).

After slightly more than 10 minutes staying behind the 25 foot mark established by the first South Bend police officer, another South Bend police officer,

who identified himself as the "crime scene tech," ordered Mr. Nicodemus and the others to move back another 25 feet, even farther away from the police activity. (*Id.* at 4 ¶ 29). There appeared to be no reason for this as the police were not being interfered with and there was no activity, criminal or otherwise, occurring. (*Id.* at 4 ¶ 30). Indeed, cars were driving through the street between Mr. Nicodemus and the police activity. (*Id.*).

Mr. Nicodemus therefore protested to the second officer that he had already been ordered by the first officer to move back 25 feet. (*Id.* at 4 ¶ 31). The second officer told Mr. Nicodemus that he would be arrested if he did not move back the additional 25 feet. (*Id.* at 4 ¶ 32). Referring to Indiana Code § 35-44.1-2-14, the second officer stated that there was a new law allowing him to order Mr. Nicodemus to move back 25 feet. (*Id.* at 5 ¶ 33). The officer specifically mentioned the 25-foot requirement that had gone into effect on July 1, 2023. (*Id.* at 5 ¶ 36). Mr. Nicodemus moved back as ordered. (*Id.* at 5 ¶ 35). The City of South Bend concedes that Indiana Code § 35-44.1-2-14 was applied to Mr. Nicodemus. (Answer and Affirmative Defenses of Defendant City of South Bend, Indiana, Dkt. 21 at 11 ¶ 35).

3.     The experience of another citizen-journalist in South Bend

Robert Perez is another citizen-journalist who frequently livestreams activities of the South Bend police department. (Declaration of Robert Perez ["Perez Dec."], Dkt. 31-1 ¶¶ 1-3). He does this because he believes it is important for the public to know what police are doing. (*Id.* at 1 ¶4). Therefore, in late August of 2023, after learning of an accident where a vehicle had struck a pedestrian, he traveled to the scene of the

accident and began to livestream to his YouTube channel. (*Id.* at 1 ¶¶ 5-7).

When he arrived, the accident victim had been removed and the South Bend police had placed yellow tape around the block. (*Id.* at 2 ¶ 8). Inside the area cordoned off by the tape there were a number of South Bend police officers conversing with a man who Mr. Perez presumed was the driver of the vehicle, which was also within the taped area. (*Id.* at 2 ¶¶ 9-11). Mr. Perez was much farther than 25 feet from the police, the individual, and the truck. (*Id.* at ¶ 11). Mr. Perez walked outside of the tape while recording and received assurances from two South Bend police officers that he could stay on the sidewalk, which remained open to pedestrians. (*Id.* at 2 ¶¶ 12-13). However, a third officer then instructed Mr. Perez to move 25 feet away from the tape and stated that he had discretion to move Mr. Perez as the "IC Code" said 25 feet. (*Id.* at 2 ¶¶ 14-16). Mr. Perez protested that other officers said he was fine where he was, but the third officer demanded that Mr. Perez move further back, and he did so. (*Id.* at 2-3 ¶¶ 17-18).

Mr. Perez believes that having to be 25 feet away from police activity may make it difficult if not impossible to record public police investigations in a way that his viewers can fully understand what is taking place. (*Id.* at 3 ¶ 19).

> 4.    Mr. Nicodemus wishes to continue to film South Bend police activity from closer than 25 feet as long as he does not interfere with the police

Mr. Nicodemus believes that he has a First Amendment right to monitor and record the police, including the right to be closer than 25 feet, as long as he is not interfering with police activity. (Nicodemus Dec., Dkt. 20-1 at 5 ¶ 38). He intends to

continue to film the South Bend police and will continue, as a citizen-journalist, to monitor and record police activities on the streets, sidewalks, and parks in South Bend, among other places. (*Id.* at 5 ¶ 37). However, he is concerned that he will be arrested for engaging in activity that he believes is protected by the First Amendment. (*Id.* at 5 ¶ 39).

## II.   Procedural history

On August 8, 2023, Mr. Nicodemus filed his Complaint for Declaratory and Injunctive Relief / Notice of Challenge to the Constitutionality of an Indiana Statute. (Dkt. 1). On August 9, 2023, he filed his Motion for Preliminary Injunction. (Dkt. 7). On August 21, 2023, the State of Indiana sought to intervene to defend the constitutionality of Indiana Code § 35-44.1-2-14, and on August 21, 2023 the district court granted the motion. (Dkts. 17 and 19).

On August 22, 2023, Mr. Nicodemus filed his memorandum in support of his motion for preliminary injunction. (Dkt. 20). Mr. Nicodemus argued that the challenged statute is facially unconstitutional as it vests unbridled discretion in the police to determine whether activity protected by the First Amendment can take place and it is therefore not content neutral. (*Id.* at 10-14). Mr. Nicodemus further argued that even if the statute could be construed as content neutral, it was nevertheless unconstitutional because it failed intermediate scrutiny as it was not narrowly tailored nor did it leave open ample alternative channels of communication. (*Id.* at 14-16). Mr. Nicodemus did not raise a challenge that the statute was substantially overbroad. His reply brief continued his arguments that the statute was

unconstitutional because it gives law enforcement unbridled discretion and because it also fails intermediate scrutiny. (Dkt. 31 at 7-12).

On September 26, 2023, the City of South Bend and the State of Indiana filed their joint memorandum opposing Mr. Nicodemus's preliminary-injunction request (Dkt. 25). Thereafter, on September 29, 2023, they filed a joint motion to consolidate the hearing on the preliminary injunction motion with the trial on the merits. (Dkt. 30). Mr. Nicodemus did not oppose the motion and it was granted by the district court on October 6, 2023. (Dkt. 32).

The trial, consisting only of argument of counsel relying on the evidence previously submitted to the district court, was held on October 13, 2023. (Dkt. 33; Transcript of October 13, 2023 hearing [Tr.] at 2-4). On January 23, 2024, the district court issued its Judgment and Opinion and Order. (S.A. at 1, 2).

The district court found that the First Amendment protected the right to record police conduct, subject to restrictions based on legitimate law enforcement needs. (*Id.* at 6-7). Although Mr. Nicodemus did not argue that the statute was unconstitutional because of substantial overbreadth, the district court concluded that Mr. Nicodemus could not succeed in his challenge because the statute was not substantially overbroad. (*Id.* at 7-16). The district court did not meaningfully address the arguments that Mr. Nicodemus presented that the statute was void because it vested standardless discretion in law enforcement personnel to determine whether or not activity could occur that was clearly protected by the First Amendment. The closest the district court came to addressing the issue of standardless discretion was to state

that the fact that the law requires that the officer be performing their duties and that the officer inform a person they move back 25 feet were "standards built within the law." (S.A. at 8). The district court did not address Mr. Nicodemus's argument that the statute failed intermediate scrutiny as it was not narrowly tailored and failed to leave open ample alternative channels of communication.

## Summary of the Argument

Mr. Nicodemus's recording of the police is an activity entitled to protection under the First Amendment. *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). Certainly, persons may be prevented from getting too close to law enforcement activity if doing so would interfere with the police, but "peaceful recording . . . in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011).

The district court, while acknowledging that Mr. Nicodemus engages in activity protected by the First Amendment, erroneously concluded that Indiana Code § 35-44.1-2-14 imposes only an incidental burden on expression. Even if that were true, the statute is unconstitutional as it fails to meet intermediate scrutiny. But the statute imposes a direct burden on the First Amendment, as denying persons the ability to approach, observe, and record police from close distances when this does not interfere with the police is at the core of the statute. "The expressive element of [citizen-journalists'] expressive activity triggers the application of [the challenged statute and therefore] First Amendment interests are in play." *Alvarez*, 679 F.3d at

602. Moreover, the statute appears to be designed to specifically target observation that does not interfere with law-enforcement activities. This is clear as there are already statutes that prohibit entering emergency incident areas declared by police and that prohibit forcible interference with law enforcement and their activities. *See* Ind. Code §§ 35-44.1-3-1, 35-44.1-4-5. The challenged statute is intended to go further and prohibits expressive conduct that does not interfere with the police. Although the statute may be applied to non-expressive conduct, it also targets speech and this is unconstitutional. *See City of Houston v. Hill*, 482 U.S. 451, 463 (1987). All of us carry cellphones that allow us to record police activity, and we are therefore all potential citizen-journalists. The statute, by allowing persons to be moved at least 25 feet away from an already-arbitrary line police designate, with the possibility of successive 25-foot banishments, imposes a significant burden that is far from incidental.

As this statute applies in public fora, it is subject to strict scrutiny unless it is content neutral. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Brown v. Kemp*, 86 F.4th 745, 782 (7th Cir. 2023). In order to be content neutral a regulation must not vest unbridled discretion in decisionmakers, as that invites discriminatory enforcement. *Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014). Without neutral criteria guiding government actors, disfavored expression may be suppressed. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 758 (1988). It is clear that Indiana Code § 35-44.1-2-14 fails the neutrality requirement. After all, law enforcement officers can invoke the statute, and move an observer back 25 feet, and perhaps farther, for no reason whatsoever. The statute

contains no standards. It "is unconstitutional because the opportunity for abuse . . . is self-evident." *Bd. of Airport Comr's of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (cleaned up).

Even if the statute is deemed to impose nothing more than an incidental burden on speech, it is still subject to intermediate scrutiny. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994). As such, the restriction on First Amendment activities must be "no greater than essential to further" an "important or substantial government interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). In other words, the restriction must be "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 791 (internal quotation and citation omitted). The restriction must also "leave open ample alternative channels of communication." *Id.*

Law enforcement officers clearly have a legitimate interest in prohibiting members of the public from interfering with their actions. However, Indiana Code § 35-44.1-2-14 allows citizens to be moved away from law enforcement for no reason whatsoever. Indiana law already contains statutes that protect police from interference, but the challenged statute makes no attempt to tailor itself to those legitimate interests and clearly burdens more expressive activity than is warranted. It is not narrowly tailored. By requiring persons to remain beyond "normal conversational distance," *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 377 (1997), persons who wish to observe and record the police and disseminate

those recordings are simply not close enough to see and hear. The statute therefore also does not leave open ample alternative channels of communication.

## Argument

I.  Standard of review

This Court has noted that "[w]e review the district court's grant or denial of a permanent injunction for abuse of discretion. Factual determinations are reviewed for clear error and legal conclusions are given *de novo* review. A factual or legal error may be sufficient to establish an abuse of discretion." *3M v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001) (internal citation omitted). Given that the relevant facts are undisputed and this case hinges entirely on the constitutionality of the challenged statute, *de novo* review is applicable.

II. The First Amendment protects the right of persons to record law enforcement and this necessarily requires that they be allowed to stand close enough to meaningfully observe and record

Mr. Nicodemus is a citizen-journalist who records the police and disseminates those recordings to the public. The district court properly recognized that his conduct is protected by the First Amendment. (S.A. at 6). As this Court noted in invalidating a statute prohibiting recording of police in public places, "[t]he act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech rights as a corollary of the right to disseminate the resulting recording." *Alvarez*, 679 F.3d at 595 (emphasis in original). This, of course, is because "First Amendment protection extends to activities necessary to produce and disseminate speech within a protected medium for the communication of ideas."

*Kemp*, 86 F.4th at 763 (internal quotation and citation omitted). This circuit is not alone in this holding. Indeed, "[e]very Circuit Court of Appeals to address this issue has held that there is a First Amendment right to record police activity in public." *Fields v. City of Philadelphia*, 862 F.3d 353, 355-56 (3d Cir. 2017) (collecting cases from five circuits, including *Alvarez,* and noting that "[t]oday we join this growing consensus. Simply put, the First Amendment protects the act of photographing, filming, or otherwise recording officers conducting their official duties in public.") (internal parenthetical omitted).

The vital role that the recording of law enforcement activities has played in our Nation's recent history is well documented, as "[t]hese recordings have both exposed police misconduct and exonerated officers from errant charges." *Fields,* 862 F.3d at 355. The court in *Fields* cited to George Holliday's "recorded video of the Los Angeles Police Department officer beating Rodney King." *Id.* More recently, "the public became aware of the circumstances surrounding George Floyd's death because citizens standing on a sidewalk exercised their First Amendment rights and filmed a police officer kneeling on Floyd's neck until he died." *Index Newspapers LLC v. U.S. Marshals Serv.,* 977 F.3d 817, 831 (9th Cir. 2020).

Of course, "the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs." *Alvarez*, 679 F.3d at 607. However, "peaceful recording . . . in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik*, 655 F.3d at 84.

In *Hill*, in the course of concluding that an ordinance making it illegal to interrupt police officers in the performance of their duties violated the First Amendment, the Court made it clear that persons have the right to subject police to verbal criticism in public. 482 U.S. at 461-63, 472. As "the First Amendment protects the right to criticize police, then *a fortiori* it protects the right to remain in the area to be able to criticize the observable police conduct." *Jordan v. Jenkins*, 73 F.4th 1162, 1169 (10th Cir. 2023). If not, "an officer could easily stop the protected criticism by simply asking the individual to leave, thereby forcing them either depart . . . or face arrest." *Id.* at 1169-70. Similarly, the constitutional right to record the police necessarily includes the right to travel close enough to law enforcement personnel to be able to meaningfully observe and record them. Thus, in *Kemp,* this Court recognized that a statute prohibiting, among other things, "approaching" hunters to record their activities, implicated the First Amendment. 86 F.4th at 763-64; *see also, e.g., Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102, 1105, 1107 (D. Ariz. 2022) (granting preliminary injunction against an Arizona statute prohibiting video recording within eight feet of law enforcement activity if the person making the recording had been directed to stop).

III.  Indiana Code § 35-44.1-2-14 violates the First Amendment because it vests unbridled discretion in law enforcement officers to determine if activity protected by the First Amendment can occur

The district court concluded that the statute was not substantially overbroad in that it imposed only an incidental, not a substantial, effect on the First Amendment

right to record. (S.A. at 12). Mr. Nicodemus did not argue substantial overbreadth.[1] And as noted below, *see infra* Section IV, even if the statute imposes only an incidental burden on expressive conduct, it fails the required intermediate scrutiny demanded by the Supreme Court. However, the statute does directly burden activity protected by the First Amendment because it bestows unrestrained discretion on law enforcement to remove persons from public areas where they can observe and record. This unbridled discretion violates the First Amendment.

A.     The statute is a direct, not an incidental, burden on activity protected by the First Amendment

The effect of the statute is to prevent persons from accessing public areas, such

---

[1]     As noted, *supra* at 8, the district court concluded that the only argument being made by Mr. Nicodemus was that the challenged statute is unconstitutionally overbroad. This is incorrect. At no point in his memoranda to the district court (Dkts. 20, 31) did Mr. Nicodemus argue overbreadth. Instead, he has always argued that the statute's unbridled discretion doomed it and, alternatively, that the statute was not narrowly tailored and did not leave open ample alternative channels of communication. *Supra* at 7-8. During oral argument, Mr. Nicodemus's counsel repeated the arguments raised in Mr. Nicodemus's submissions—the law is unconstitutional because it contains no standards to guide officers or, alternatively, it fails intermediate scrutiny. (*Id.*). No overbreadth argument was raised. At one point the district court asked Mr. Nicodemus's counsel if the only challenge being made was that the statute was overbroad, and counsel said it was not, instead indicating that the challenge was because the statute was both content-based and not narrowly tailored. (Tr. at 19). Counsel never indicated that the challenge was to any substantial overbreadth of the statute, agreeing only that overbreadth in this context meant that the statute had no core because it contained no standards. (*Id.*). Counsel subsequently emphasized to the district court that this was not a challenge based on overbreadth:

> And the problem, of course, is not overbreadth. The problem is that the Supreme Court has repeatedly held, and the Seventh Circuit has repeatedly held, that if you have a statute that impinges on the First Amendment, there has to be standards.

(*Id.* at 50). Nevertheless, the district court erroneously concluded that only an overbreadth challenge had been advanced by Mr. Nicodemus. (S.A. at 7, n.4).

as sidewalks and street corners. While at times, it may be necessary for police to deny such access, those instances are the exception, not the rule. When Mr. Nicodemus or other citizen-journalists approach the police to record their activities, they are engaging in activity that the statute specifically targets.  In reaching its conclusion that the statute creates only an incidental burden on expression, the district court appears to have reasoned that since the challenged law can also be applied against conduct that is not expressive, the burden on expression is therefore incidental. This is not correct. While it is true that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech," *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011),"[w]hen the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play," *Alvarez*, 679 F.3d at 602.

The restriction on the expressive activities of Mr. Nicodemus and other citizen-journalists is therefore not incidental, but at the very core of the challenged statute. This is no different than the situation presented in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), where a challenge was raised to a statute that prevented the provision of material support or resources to a foreign terrorist organization. *Id.* at 7. The plaintiffs argued that they wanted to train a designated foreign terrorist organization on how to engage in expressive conduct—using international law, petitioning international bodies, and engaging in political advocacy. *Id.* at 14-15. The Court rejected the government's argument that the statute only incidentally burdened plaintiff's expression because it concerned itself primarily with conduct

rather than speech. *Id.* at 26-27. "The law here may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message," thereby demanding exacting scrutiny. *Id.* at 28.

Similarly, in *Hill*, the Supreme Court rejected the argument that the challenged ordinance making it illegal to interrupt police officers in the performance of their duties only concerned itself with conduct that was not protected by the First Amendment. 482 U.S. at 459-60. Although the statute certainly applied to non-expressive conduct, it also applied to speech and "[t]he Constitution does not allow such speech to be made a crime." *Id.* at 462 (footnote omitted).

Here, the statute attempts to regulate citizen-journalists' expression—recording police activity—by allowing them to be pushed back to distances from which they cannot effectively engage in their expression. "Because the First Amendment protects conduct and activities necessary for expression," it also protects the ability to approach the police as this is "essential to carry out plaintiff['s] protected monitoring and recording." *Kemp*, 86 F.4th at 779. The statute imposes a direct burden on this expressive act, and this is so even though the statute could be applied to other, non-expressive activities without implicating the First Amendment.

There is no need to go further to demonstrate that the statute imposes a direct burden on expressive activity. But it is not unreasonable to conclude that the purpose of the statute is to provide a tool for law enforcement to push persons back who wish to observe and record their activities, even when there is no law-enforcement reason

to do so. After all there is already a statute that, reasonably, allows persons to be kept away from areas where there are emergencies. *See* Ind. Code §§ 35-44.1-4-1.5, 2, 5. And another statute, Indiana Code § 35-44.1-3-1, creates an offense if a person "forcibly resists, obstructs, or interferes with a law enforcement officer . . . while the officer is lawfully engaged in the execution of the officer's duties." A burden on expressive conduct flowing from a government regulation is incidental if the burden flows indirectly from the purpose of the regulation. *See, e.g., 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 n.6 (2023). But the core purpose of the challenged statute is to prevent persons from getting close enough to observe and obtain information about what the police are doing. This directly burdens activity protected by the First Amendment.

This statute is a sword to wield against persons who only want to observe and potentially record law enforcement activity. Any argument that the challenged law will have only an incidental burden on activity protected by the First Amendment because only a few persons approaching the police will be journalists or citizen-journalists ignores the realities of the 21st century. After all, with our cell phones, we all carry video cameras in our pockets and may, at a moment's notice, become newsgatherers. "[C]hanges in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw. The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders." *Glik*, 655 F.3d at 84.

The district court minimized the significance of the 25-foot boundary,

commenting that "[i]n this day of enhanced technology," including zoom lenses, parabolic microphones, drones, and increasing capabilities of cellphones, "it seems rather strained to argue that citizens will suffer a substantial burden on their ability to record meaningfully." (S.A. at 13). Future capabilities of cell phones notwithstanding, the bystanders whose cell phones allow them to document the events around them are going to be responding to events as they happen—such as the murder of George Floyd. They will not run home to grab parabolic microphones, zoom lenses, or drones, even if they have them available.

The Supreme Court has recognized that being forced to be more than 15 feet away from someone is beyond "a normal conversational distance." *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 364, 377 (1997). In *Glik*, qualified immunity was denied to officers who arrested a person filming them from "roughly ten feet away." 655 F.3d at 80.[2] As noted, the statute preliminarily enjoined in *Arizona Broadcasters Association* made it unlawful to videorecord law enforcement from a distance closer than eight feet after being directed to move back. 626 F. Supp. 3d at 1105. Not surprisingly, both Mr. Nicodemus and Mr. Perez attested that having

---

[2] The woman who recorded George Floyd's murder has reported that she was but a few feet away when she made her recording. Joe Hernandez, NPR, *Read this Powerful Statement from Darnella Frazier, Who Filmed George Floyd's Murder*, May 26, 2021, at https://www.npr.org/2021/05/26/1000475344/read-this-powerful-statement-from-darnella-frazier-who-filmed-george-floyds-murd (last visited Feb. 26, 2024). Would Eric Garner's final words, "I can't breathe," which became a national rallying cry for advocates, have been heard if video of his death was taken from 25 feet away or if the many officers present had moved citizen-journalists back successive 25-foot increments. *See generally,* Joseph Goldstein and Nate Schwerber, THE NEW YORK TIMES, July 18, 2014, https://www.nytimes.com/2014/07/19/Nyregion/staten-island-man-dies-after-he-is-put-in-chokehold-during-arrest.html (last visited Feb. 29, 2024).

to be at least 25 feet away (and perhaps farther away if the officer is already physically removed from the scene when they invoke the statute, or if the officer or different officers successively invoke multiple 25-foot perimeters) may make it difficult, if not impossible, to create recordings that allow viewers to see and hear what is happening. (Nicodemus Dec. Dkt. 20-1 at 2 ¶11; Perez Dec. Dkt. 31-1 at 3 ¶ 19).[3] Twenty-five feet is a significant distance. In any event, it is up to Mr. Nicodemus and other persons to decide how they wish to exercise their First Amendment rights as "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988).

We are all potential citizen-journalists with an interest in observing law enforcement and, where appropriate, publicizing what we observe and record. Indiana Code § 35-44.1-2-14 therefore imposes a direct burden on the First Amendment as it is "susceptible of regular application to protected expression." *Hill*, 482 U.S. at 467.

---

[3]     The district court dismissed Mr. Perez's experience as not relevant as he did not, in the court's estimation, demonstrate that the prohibition imposed on his recording was pursuant to the challenged statute as opposed to the emergency incident law. (S.A. at 14 n. 7).  This ignores the fact that he was standing more than 25 feet away from the incident, behind the tape that can be set out as demarcation of an emergency incident area, Ind. Code § 35-44.1-4-2(1), when he was told by another officer to move back another 25 feet, after other officers had indicated that he was fine where he was. (Perez Dec. Dkt. 31-1 at 2 ¶¶ 11-16). This order was clearly because of the challenged statute. In any event, Mr. Perez is certainly competent to point out the obvious—having to observe and record police activity from more than 25 feet away "may make it more difficult if not impossible to record the police investigation in a way that my views can fully understand what is taking place." (*Id.* at 3 ¶ 19).

B. Indiana Code § 35-44.1-2-14 is unconstitutional as it vests unbridled discretion in law enforcement to determine if expressive activity may occur

    1. The content-neutrality requirement imposed on the regulation of expressive conduct is violated if there are no standards that constrain the action of the government

The challenged statute allows law enforcement to ban expressive conduct within 25 feet of an officer even if the person wishing to observe and record the officer is on a sidewalk, street, or in a park. These locations, of course, are "quintessential public forums," where First Amendment rights are at their zenith. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). In a public forum, regulations that impinge upon First Amendment activities are unconstitutional unless they are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citations omitted).

As this Court has held, in order "[t]o qualify as 'content neutral,' a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." *Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) (citing *Thomas v. Chicago Park. Dist.*, 534 U.S. 316, 323 (2002); *Forsyth Co. v. Nationalist Movement*, 505 U.S. 123, 130-33 (1992); and *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 578-79 (7th Cir. 2002)). The same prohibition applies to any regulation of expressive activity, whether or not subject to a formal licensing scheme, if there are no standards that constrain the decisionmakers. Thus,

in *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018), the Supreme Court concluded that a Minnesota statute prohibiting persons from wearing political badges, buttons, or other insignia within a polling place was unconstitutional because this statutory authority was not "guided by objective, workable standards." *Id.* at 21. And in *Hill*, the Court recognized that enforcement of the ordinance prohibiting interference with the police was subject to the "unguided discretion" of law enforcement, vesting "unconstitutional discretion" in its enforcement. 482 U.S. at 466-67.[4]

Objective standards are absolutely necessary to "provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 758 (1988). Without these "neutral criteria" it is easy for government actors to "suppress[] unfavorable expression." *Id.* at 758, 760 (cleaned up).

2. Indiana Code § 35-44.1-2-14 is unconstitutional as it vests unbridled discretion in law enforcement officers

In order to invoke the 25 foot barrier allowed by Indiana Code § 35-44.1-2-14, law enforcement need only be "lawfully engaged" in their duties. There are no

---

[4]     Some cases have referred to the prohibition against "unbridled discretion" as a stand-alone requirement, separate from the requirement of content neutrality and other requirements for a reasonable time, place, and manner restriction. *See, e.g., GEFT Outdoor, LLC v. Monroe County, Indiana*, 62 F. 4th 321, 327 (7th Cir. 2023) (variance procedure must be "content neutral, narrowly tailored, leave open ample alternative avenues for speech, and not put too much discretion in the hands of government officials." (citation omitted) (cleaned up). Regardless, government discretion must be constrained by standards to avoid censorship. *Id.*

standards contained in the law. Nevertheless, the district court described the "lawfully engaged" requirement and the requirement that an officer inform a person they cannot approach within 25 feet as "standards built within the law." (S.A. at 8). The requirement of being "lawfully engaged" just means that an officer is on duty, which could mean walking down a sidewalk on the way to lunch. This is not a standard describing the circumstances under which the statute can be invoked. And requiring that persons be informed that they move back before being arrested for failing to do so is similarly not a standard that constrains an officer: it is merely a description of the manner in which officers, in their unbridled discretion, may restrict speech. As noted above, "discretion must be guided by objective, workable standards." *Minnesota Voters Alliance*, 585 U.S. at 21. The standards must be "narrowly drawn, reasonable and definite." *Thomas,* 534 U.S. at 324 (internal quotation and citation omitted). Requiring that officers be on duty and that they inform a person that they must retreat 25 feet, or successive 25-foot distances, is not a "guide" that cabins their discretion. The statute contains no standards.

The standardless nature of the statute is therefore evident from its language. It is also evident from the experiences of Mr. Nicodemus and Mr. Perez who were first informed that they were allowed to be behind an initial perimeter of 25 feet or more, only to be told by different officers that they had to move back even farther. What standards did the officers apply, and why did different officers give diametrically opposed orders? These officers were obviously applying different standards, precisely as the statute empowers them to do.

The challenged law is aimed at expressive conduct protected by the First Amendment—the right to observe and record police and publish those observations and recordings. And the law permits an individual officer to make the determination of whether such expressive conduct can occur on the basis that the officer would prefer not to be observed, or for any other reason, or no reason at all, even if there would be no danger, interference, or other harm if the observer were closer than 25 feet from the officer.

It certainly cannot be presumed that law enforcement "will act in good faith and adhere to standards absent from the [statute]'s face [as] this is the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood*, 486 U.S. at 770.[5] The bottom line is that there is nothing constraining law enforcement from ordering Mr. Nicodemus to move to a distant location, while someone who is perceived as being favorable or neutral towards the police may be allowed to be closer. This is the precise danger manifested by the unbridled discretion in an enactment as it "confers on police a virtually unrestrained power to arrest and charge persons . . [and] is unconstitutional because the opportunity for abuse . . . is self-evident." *Bd. of Airport Commr's of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (internal quotations and citations omitted) (cleaned up). This is not a hypothetical danger. After all, although Mr. Nicodemus was directed to move farther and farther away from the South Bend police officers, other persons—those

---

[5] The district court dismissed the likelihood of law enforcement utilizing the statute where there is "no legitimate interest in situating a citizen 25 feet away." (S.A. at 13). This is the precise presumption that *City of Lakewood* prohibits.

passing by in vehicles—were allowed to travel closer to the police, through the area closed off to Mr. Nicodemus. (Nicodemus Dec. Dkt. 20-1 at 3 ¶ 24, 4 ¶ 30). Mr. Perez was on the sidewalk with the permission of two South Bend police officers when he was ordered to move back an additional 25 feet. (Perez Dec., Dkt. 31-1 at 2-3 ¶¶ 13-18). Would a pedestrian without a recording device have been pushed back? The challenged statute "allow[s] for arbitrary and discriminatory enforcement." *Kemp*, 86 F.4th at 775 (internal quotation and citation omitted).

Indiana Code § 35-44.1-2-14 therefore fails the content neutrality requirement because "there are no standards governing the exercise of the discretion granted by the" statute and this "permits and encourages and arbitrary and discriminatory enforcement of the law." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972). A content-based impingement on First Amendment rights can be upheld only if it meets the strictest form of constitutional scrutiny—it must be narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015) (citations omitted). Not surprisingly, cases appear not even to reach the "narrowly tailored" analysis when an enactment is found to grant unbridled discretion to allow or deny activity protected by the First Amendment, instead concluding simply that the grant of unbridled discretion violates the First Amendment. *See, e.g.*, *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572-74 (7th Cir. 2001); *see also McDonald v. City of Chicago*, 243 F.3d 1021, 1026 (7th Cir. 2001) ("It is well established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech.")

(citations omitted). This is undoubtedly because legislation that grants unfettered discretion to a decisionmaker can never be narrowly tailored insofar as the discretion could always be cabined by enacting standards relevant to the governmental interest at play. A statute that prevents anyone from approaching within a prescribed distance of police activity when their presence would interfere with the activity or public safety would be narrowly tailored. The challenged statute, which allows persons to be moved back for any reason or for no reason at all, is not. There are no standards in the challenged statute that would allow citizen-journalists and potential citizen-journalists to be pushed back only if there were reasons to do so. Given that the Indiana Code already contains such statutes, the only conclusion that can be drawn is that the challenged statute was intended to bestow this unrestrained discretion. The statute is unconstitutional.

IV.  The statute fails the intermediate scrutiny imposed on an enactment that only has an incidental burden on expressive conduct

A.  The requirements for intermediate scrutiny

Although content-based restrictions on expression are subject to strict scrutiny, "content-neutral restrictions that impose an incidental burden on speech" are subject to "intermediate scrutiny." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989); *United States v. O'Brien*, 391 U.S. 367 (1968)). The *O'Brien* Court held that if conduct containing "speech" and "nonspeech" elements is present, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." 391 U.S. at 376. Such an incidental

restriction is justified "if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than essential to further that interest." *Id.* at 377. In *Ward,* the Court held that "restrictions on the time, place, or manner of protected speech" are permissible "provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels of communication." 491 U.S. at 791 (internal quotation and citation omitted).

Although the two cases use slightly different verbiage to describe the test for "intermediate scrutiny," "the *O'Brien* test in the last analysis is little, if any different from the standard applied to time, place, or manner restrictions." *Id.* at 798 (internal quotation and citation omitted); *see also, e.g., Ben's Bar, Inc. v. Village of Somerset,* 316 F.3d 702, 714 (7th Cir. 2003) ("For all practical purposes, however, the distinction [between the tests noted in the cases] is irrelevant because the Supreme Court has held that the time, place, and manner test embodies much of the same standards as those set forth in *United States v. O'Brien.*") (citations omitted). Of course, given that a regulation cannot be content neutral if it grants a decisionmaker unbridled discretion as to whether or not to allow activity and expression to occur that is protected by the First Amendment, *supra*, there is no need to consider the application of intermediate scrutiny. But if such scrutiny is applied, the challenged statute still

fails as it is not narrowly tailored since the restrictions it imposes on First Amendment freedoms are much greater than essential to further any legitimate interests served by the statute. Moreover, the challenged statute fails to provide ample alternative channels to engage in protected expression for those burdened by it.

B. The statute fails the narrow tailoring requirement as its burden on First Amendment expression is much greater than is necessary to further the government's legitimate interests

The requirement that a regulation be narrowly tailored compels the government to show "that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner*, 512 U.S. at 665 (quoting *Ward*, 491 U.S. at 799). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted).

The district court catalogued the "evil" that it believed the challenged statute addresses as interfering with official police business, which includes investigation, securing evidence, discussion with witnesses and suspects, and effectuating arrests. (S.A. at 9-10). The district court further noted that "[n]o one can seriously doubt that a buffer law could have these plainly legitimate applications in its sweep, though in Indiana a separate law largely covers these applications already. *See* Ind. Code § 35-44.1-4-2." (*Id.* at 10).

Of course, the existence of this other statute serves to demonstrate precisely why the challenged statute is not narrowly tailored. While "no one can seriously

doubt" that a statute that prohibits actual interference with legitimate police activity is constitutional, Indiana already has laws on the books prohibiting such interference—the emergency incident area statute, Ind. Code § 35-44.1-4-2, and the statute prohibiting forcible resistance, obstruction, or interference with law enforcement, Ind. Code § 35-44.1-3-1. Those laws target, in a much narrower manner, the actual "evils" detailed by the district court. If the Indiana General Assembly believes that there are other examples of potential interference and obstruction with police activities that are not covered, it is free to legislate to address those issues.

To satisfy the requisite tailoring, the statute may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. There is no dispute that there may be some circumstances in which police may lawfully prohibit a person from approaching an area if that activity would constitute interference. The problem is that the statute allows persons to be moved away from police when there are no reasons to do so. Proper tailoring requires that the statute's reach be restricted to "evils" that necessarily are limited to matters that actually interfere with police activities. Of course, this statute is not properly tailored. Observation and recording "in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011). Yet, the statute allows and is specifically aimed at such limitation.

It is the State's burden to demonstrate that the statute meets the requirement that it not burden more speech than is necessary. *Turner,* 512 U.S. at 665. This is a

burden that the State cannot meet given the failure of the challenged statute to contain any requirement that the 25-foot barrier be based on legitimate need or any need at all. This Court has stressed that "the Supreme Court has invalidated bans on expressive activity that are not the substantive evil if the state had alternative means of combating the evil." *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694, 698 (7th Cir. 2013). The evil here is actual interference with law enforcement. But the statute goes much further than that. Indiana Code § 35-44.1-2-14 is not narrowly tailored, and it is therefore unconstitutional even under intermediate scrutiny.

C. The challenged statute does not leave open ample alternative channels of communication

In assessing whether the challenged statute leaves open ample alternative channels of communication to those who want to observe and record law enforcement activity from within 25 feet, while not interfering with the police, it is certainly true that "[a]n adequate alternative does not have to be the speaker's first choice." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) (citations omitted). However, "an alternative must be more than merely theoretically available. It must be realistic as well. . . . [and] it cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Gresham v. Peterson*, 225 F.3d 899, 906-07 (7th Cir. 2000) (citation omitted).

This Court has stressed that "audio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public. Their self-authenticating character makes it highly unlikely that other methods could be considered reasonably adequate substitutes."

*ACLU of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012). Of course, the challenged

statute does not ban all audio and video recording in public. But it does allow police

to arbitrarily require persons to move an initial 25-foot distance, and then perhaps

more increments of 25 feet. And although the district court attempted to minimize

the significance of these 25-foot barriers (S.A. at 13), they greatly restrict the ability

of persons to observe and record law enforcement. As noted, the Supreme Court has

recognized that a distance of 15 feet places a person farther away than "a normal

conversational distance," *Schenck*, 519 U.S. at 377. Of course, many recordings of

police will not involve normal conversations, but may involve a number of persons

talking, vehicular traffic and other background noises, and numerous other factors

that make it impossible to meaningfully observe and record either voices or video

from a distance of 25-feet or more. Both Mr. Nicodemus and Mr. Perez attested to the

fact that at a 25-foot distance they might not be able to discern and capture what is

happening. (Nicodemus Dec., Dkt. 20-1 at 2 ¶ 11; Perez Dec., Dkt. 31-1 at 3 ¶ 19).

Even the district court recognized that being banished to a distance of 25 feet

or more may have restricted Mr. Nicodemus from "pick[ing] up quieter conversations

. . . but no one has the right to broadcast an entire event." (S.A. at 14). But citizen-

journalists do have right to record and broadcast police activity if they are not

interfering with it. Assuming that there is no interference with law enforcement,

what are the other channels of communication that are available to Mr. Nicodemus

and other citizen-journalists to meaningfully record the police, "an integral step in

the speech process"? *Alvarez*, 679 F.3d at 600. There are none. Indiana Code § 35-

44.1-2-14 does not leave open ample alternative channels of communication.

## Conclusion

"[T]he First Amendment . . . prohibit[s] government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). Indiana Code § 35-44.1-2-14 allows that "stock of information" to be limited without justification or standards and violates the First Amendment. The district court should be reversed and the statute should be permanently enjoined.

*s/ Kenneth J. Falk*
Counsel of Record
Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Appellant

**Certificate of Compliance**

I hereby certify that this brief conforms to Circuit Rule 32.

1.     This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 8,998 words based on the "Word Count" feature of Microsoft Word.

2.     This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font for the body of the brief and 11-point font for footnotes.

s/ *Kenneth J. Falk*
Attorney at Law

AO 450 (Rev. 01/09)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
## Northern District of Indiana

DONALD NICODEMUS
                    Plaintiff

            v.                                          **Civil Action No.**      3:23cv744

SOUTH BEND, INDIANA CITY OF
                    Defendant

INDIANA ATTORNEY GENERAL OF THE STATE OF
                    Intervenor

## JUDGMENT IN A CIVIL ACTION

The court has ordered that (*check one):*

☐ the plaintiff _____recover from the defendant _____ the amount of _____
 dollars $_____, which includes prejudgment interest at the rate of _____% plus post-
judgment interest at the rate of _____% along with costs.

☐   the plaintiff recover nothing, the action is dismissed on the merits, and the defendant _____
recover costs from the plaintiff _____.


**X** Other:_ The court enters judgment for the defendant, City of South Bend, and the intervenor,
State of Indiana, and against the plaintiff, Donald Nicodemus.

This action was (*check one):*


☐ tried to a jury with Judge _____ presiding, and the jury has rendered a verdict.


☐ tried by Judge _____ without a jury and the above decision was
reached.

**X** decided by Judge Damon R. Leichty on a motion for permanent injunction._____


DATE: January 12, 2024_____          *Chanda J. Berta, Clerk Of Court*

                                        by s/ D. Johnson_____
                                        *Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DONALD NICODEMUS,

Plaintiff,

v.                                                          CAUSE NO. 3:23cv744 DRL

CITY OF SOUTH BEND, INDIANA,

Defendant.

OPINION AND ORDER

On July 1, 2023, Indiana's so-called buffer law took effect, criminalizing as a misdemeanor a person's unlawful encroachment on a police officer's lawful duties. This buffer law prohibits a person from knowingly or intentionally approaching within 25 feet of an officer engaged in his or her lawful duties after the officer orders the person to stop approaching. *See* Ind. Code § 35-44.1-2-14.

Law enforcement officers have jobs to do, and often difficult jobs that require decisionmaking in tense, uncertain, fluid, and unsafe circumstances. At the same time, the public has a right to record the police. Audiovisually recording police activity fits within the First Amendment's guarantee. The right isn't unlimited, but robustly it exists to serve important purposes. It facilitates transparency, training, scrutiny of police misconduct, and the exoneration of officers from unfair charges. Candid critique of our government and its officials matters in a free society. By shining a light on newsworthy police conduct, the public's recordings benefit our citizens and law-abiding officers alike.

Donald Nicodemus periodically livestreams police encounters to the public on his YouTube channel. He has the right to do so. On July 20, 2023, South Bend police officers moved him back from a shooting investigation in town, referencing this new law while he continued to film. In this suit, he argues that Indiana's buffer law violates the First Amendment to the United States Constitution because

S.A. 2

it is facially overbroad. After intervening, the State of Indiana defends the new law's constitutionality. The parties agree to consolidate this matter for a trial on the merits and a permanent injunction.[1]

The buffer law is not unconstitutional by virtue of being facially overbroad. The law has many legitimate applications; and, on this record, any effect on speech is minimal and incidental only, particularly in this day and age of sophisticated technology in the hands of most any citizen and at a modest distance of 25 feet. Whether the wisest iteration of a law that promotes the safety of officers and citizens and that serves other legitimate interests, the statute is not constitutionally overbroad. For this reason, the court now denies a permanent injunction.

## FINDINGS OF FACT

For several years, Mr. Nicodemus has regularly recorded police activity in the South Bend, Indiana area. He posts these recordings on his YouTube channel—"Freedom 2 Film"—with the hope that his more than 23,000 subscribers will better understand what law enforcement officers do and to shine a light on inappropriate police behavior. He livestreams videos. He says it is sometimes necessary to get within 25 feet of police activity so that his recordings are discernable to viewers.

In the early morning hours of July 20, 2023, Mr. Nicodemus went to the intersection of North Brookfield Street and Lincoln Way West in South Bend after hearing a report of shots fired there.[2] Six South Bend squad cars were at the scene along with several officers. Mr. Nicodemus noticed an officer marking bullet casings on the southwest corner of the intersection, so he stood on the northeast corner of the intersection and began livestreaming.

---

[1] The court commends all counsel for the quality of their submissions and their advocacy.

[2] Into evidence the court received two videos showing the evening's events, including the video taken by Mr. Nicodemus [Ex. 2] as well as bodycam footage from Officer Nathan Stepp [Ex. 1]. In addition, the court reviewed affidavits from several individuals, a proposed Rule 702 report, and certain South Bend Police Department policies.

Shortly after a semitruck was permitted to traverse the intersection,[3] Officer Nathan Stepp walked over to Mr. Nicodemus and ordered him and others to move back, walking off 25 feet from the west side of Brookfield Street. Why exactly he chose this point remains unclear, though an SBPD squad car was situated there. Officer Stepp says he moved the group of individuals, including Mr. Nicodemus, back so that they would not interfere with a potentially dangerous situation. He didn't mind the recording.

From watching the videos (both Officer Stepp's bodycam and the video taken by Mr. Nicodemus), there might be some question whether the officers were actually acting under Indiana's buffer law or Indiana's emergency incident perimeter law that was amended in 2023 at the same time as the buffer law was enacted, likewise to 25 feet (reduced from 150 feet). But the State seems to concede that the officers were acting under the buffer law such as to confirm Mr. Nicodemus's standing today.

Indiana's buffer law criminalizes as a misdemeanor a "person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching." Ind. Code § 35-44.1-2-14. Initially by Officer Stepp, Mr. Nicodemus was only moved back a few steps. From this position, Mr. Nicodemus continued to record the activities of law enforcement, continued to report to his online followers, continued to engage the officers in conversation and criticism, and continued to capture audio of officers even beyond 25 feet.

Shortly after, a loud disturbance occurred at a house on the north side of Lincoln Way West past the intersection and past a closed retail building. From his position, Mr. Nicodemus could not record the house or this disturbance as officers approached the home. Either Mr. Nicodemus or another videographer next to him noted on video that they could move outside the shooting scene to a nearby

---

[3] Officer Stepp said he directed several vehicles away from the intersection, but he was told by another officer that he could allow a semitruck to pull through. He says a passenger vehicle errantly went through despite the presence of police cars blocking the road.

alley to view the disturbance, but by choice they stayed put.

Mr. Nicodemus and another videographer levied criticism toward the officers by yelling and swearing and asserting their right to record. Officer Jeffrey Veal walked to Mr. Nicodemus and others in response to the shouting. Officer Veal told the group that he was the crime scene technician (a position he has held since 2019), that the area of the intersection was a crime scene, and that they needed to move back another 25 feet. He referenced the "new law" from July 1.

Of note, a car had driven down Brookfield Street—straight through this location staked out by Officer Veal. Mr. Nicodemus protested that he had already been moved back 25 feet by Officer Stepp, but Officer Veal stood by his order and told Mr. Nicodemus he would go to jail if he didn't comply. Someone shouted an obscenity to Officer Veal, and the group continued to yell and swear. Officer Veal retrieved a ten-foot tape to measure his newly prescribed distance from the intersection, though it was not demonstrably far from the point that Mr. Nicodemus originally had chosen for his video.

CONCLUSIONS OF LAW

An injunction is a "very far-reaching power, never to be indulged [] except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). The parties consolidated this matter for a trial on the merits. To prevail at this stage, Mr. Nicodemus must show that (1) absent injunctive relief, he will suffer irreparable harm, (2) there is no adequate remedy at law, and (3) he succeeds on the merits of his claim. *City of Chi. v. Barr*, 961 F.3d 882, 893 (7th Cir. 2020) ("preliminary injunctive relief requires only a showing of a likelihood of success on the merits, whereas permanent relief requires a determination on the merits"); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 n.12 (1987) (same); *Tully v. Okeson*, 977 F.3d 608, 612-13 (7th Cir. 2020). If he makes these threshold showings, the court "consider[s] the balance of harms between the parties and the effect of granting or denying [an] injunction on the public interest." *Tully*, 977 F.3d at 613 (quotation omitted). This case falters on the third prong—the lack of success on the merits—so the court addresses no other.

4

S.A. 5

A.  *First Amendment*.

A state legislature "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I; *see also* U.S. Const. amend XIV; *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"). "Audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas []. . . . The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). Such recording enables speech. *See Alvarez*, 679 F.3d at 597.

This right includes recording police conduct. *Id.* A "peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik v. Cunnife*, 655 F.3d 78, 84 (1st Cir. 2011). The First Amendment "protects the right to remain in the area to be able to criticize the observable police conduct. Otherwise, an officer could easily stop the protected criticism by simply asking the individual to leave, thereby forcing them to either depart (which would effectively silence them) or face arrest." *Jordan v. Adams Cnty. Sheriff's Off.*, 73 F.4th 1162, 1169-70 (10th Cir. 2023); *see also Brown v. Kemp*, 2023 U.S. App. LEXIS 30112, 68 (7th Cir. Nov. 13, 2023) (visual proximity essential to recording activity). These recordings valuably serve law enforcement and the public. They facilitate transparency, training, scrutiny of police misconduct, and exoneration of officers from unfair charges. *See Fields v. City of Phila.*, 862 F.3d 353, 355 (3rd Cir. 2017).

But it "goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations. [Though] an officer surely cannot issue a 'move on' order to a person *because* he is recording, the police may order bystanders to disperse for reasons related to public safety and order and

other legitimate law-enforcement needs." *Alvarez*, 679 F.3d at 607. The court scrutinizes criminal statutes, such as the one today, with particular care because "those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

B.  *Substantial Overbreadth.*

Mr. Nicodemus mounts a facial overbreadth challenge only.[4] To prevail on this type of facial attack, he must demonstrate that the challenged law, though it may be validly applied to him and others, "nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988) (quotations omitted). There must be "a realistic danger that the statute [] will significantly compromise recognized First Amendment protections of [third] parties." *Id.* Such a challenge is "justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power." *Id.*

The statute must be "substantially" overbroad for Mr. Nicodemus to succeed. *Id.* To be precise, a law may be invalidated as overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021); *see also City of Houston*, 482 U.S. at 458 (statute must reach a "substantial amount of constitutionally protected conduct"). That is the rule here because no one argues that this statute has no constitutional applications; otherwise put, the parties recognize the statute might be constitutionally applied at times. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008).

To illustrate this rule of law in action, in *United States v. Stevens*, 559 U.S. 460, 481-82 (2010), a federal statute criminalizing the commercial creation, sale, or possession of depictions of animal cruelty was overbroad because it would cover hunting videos and magazines—a substantial amount of protected

---

[4] The court offers no views on any other constitutional analysis because none other has been argued. Mr. Nicodemus confirmed at oral argument that he advances no other challenge, including a vagueness challenge.

speech—while targeting within its plainly legitimate sweep videos of animal cruelty ("crush" videos) and animal fighting. In contrast, in *Broadrick v. Oklahoma*, 413 U.S. 601, 617-18 (1973), a statute prohibiting classified state employees from soliciting or receiving any contribution for any political organization, candidate, or other political purpose, as well as membership in any political party's committee, was not overbroad merely because it might also cover wearing political buttons or using bumper stickers; these applications of the statute were not substantial compared to prohibiting "clearly partisan political activity" in the interest of ensuring unbiased state employees.

Slight overbreadth isn't enough. There is another way to address slight overbreadth. Rather than a facial attack, a challenger can argue that the statute is unconstitutional as applied to him. For example, in *New York v. Ferber*, 458 U.S. 747, 766 (1982), a New York statute prohibiting persons from knowingly promoting an underage child's sexual performance by distributing materials depicting such performance was not constitutionally overbroad though, as written, it would forbid too the distribution of other material with arguable literary, scientific, or educational value or material outside the harms the state sought to combat. This was deemed a "paradigmatic case of a state statute whose legitimate reach dwarfs its arguably impermissible applications," such that "whatever overbreadth may exist [could] be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Id.* at 773-74. No as-applied challenge was made here, so there must be substantial overbreadth to declare this law unconstitutional today.

The State has demonstrated the buffer law's plainly legitimate sweep. *See Alvarez*, 679 F.3d at 607. Viewing this statute as only preventing interference with police activities is myopic. It criminalizes encroachment. It criminalizes a person's knowing encroachment into a zone of integrity that facilitates the performance of an officer's duties, and only then the officer's lawful duties, and only after the officer has advised the person to cease approaching, and only then within 25 feet. These are standards built within the law, and it isn't a regulatory scheme for prior approval of the right to record that requires more

workable standards. *Cf. Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988); *Broadrick*, 413 U.S. at 613. The law isn't directed toward speech, but encroachment. The law affords law enforcement officers the uninterrupted and unimpeded ability to do their jobs, including as examples the need to investigate, secure evidence and statements, and conduct other official police business safely; and it protects the integrity of government processes as well as suspects, victims, witnesses, and other citizens interacting with law enforcement from harm.

Foremost, the law promotes officer and public safety by ensuring that someone at a close distance cannot harm or hinder those charged with and engaged in their lawful duties, particularly when 25 feet affords an officer mere seconds of reaction time to respond to someone approaching at a walk, much less with ill-intent at a short sprint. *See United States v. Bonin*, 932 F.3d 523, 535 (7th Cir. 2019) (public safety compelling); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016) (officer safety a particularly important governmental interest). An officer can take reasonable steps to promote safety and to maintain control. *Alvarez*, 679 F.3d at 607 (officer "may order bystanders to disperse for reasons related to public safety" and for "other legitimate law-enforcement needs"); *see, e.g., Colten v. Kentucky*, 407 U.S. 104, 109 (1972) (rejecting First Amendment right to congregate on side of highway to "observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time").

This buffer law also protects arrestees, suspects, victims, informants, witnesses, and other citizens from harm and inappropriate disclosure of confidential investigative facts. *See Alvarez*, 679 F.3d at 607 (officer may secure crime scenes and protect the confidentiality of investigations). Nothing about this law forecloses a reporter or concerned citizen from audiovisually recording conversations that occur openly in public and at a volume audible to bystanders at 25 feet. But not all conversations in public places are entitled to be recorded. "[S]ome conservations in public places implicate privacy." *Alvarez*, 679 F.3d at 608; *see also Katz v. United States*, 389 U.S. 347, 351 (1967) ("But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); *John K. Maciver Inst. for Pub. Pol'y,*

*Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2023) ("right to speak and publish does not carry with it the unrestrained right to gather information").

This law protects the confidentiality of official law enforcement inquiries—questioning suspects, aiding the injured, safeguarding a victim, extracting information from an informant, or taking reports from witnesses. In such encounters, any one of these persons might be averse to speaking freely if he or she knew it would be posted on social media or broadcast on the evening news. To put a finer point on this, the law dissipates the risk of exposure or marginalization of a victim who might be endangered or embarrassed from immediately adjacent recording, *see, e.g., Fla. Star v. B.J.F.*, 491 U.S. 524, 537 (1989); and it protects the privacy interests of third-parties who might be targeted (but not charged) or who might be witnesses or informants, *see, e.g., Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 978 F. Supp.2d 1, 9 (D.D.C. 2013). They have certain privacy rights even when police may not. They have First Amendment rights too that otherwise might be curtailed. This law mitigates impairing law enforcement's ability to acquire information effectively or endangering their safety by distracting them from their official duties with happenings in their immediate vicinity. In doing so, the buffer law preserves not only the confidentiality of investigations but promotes the efficient administration of law enforcement. *See Bonin*, 932 F.3d at 535 ("protecting the integrity of government processes is compelling").

The State advances other legitimate applications for this buffer law—effectuating arrests and the like. *See City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 435 (2002) (reducing crime); *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (making arrests safely and without interference). No one can seriously doubt that a buffer law could have these plainly legitimate applications in its sweep, though in Indiana a separate law largely covers these applications already. *See* Ind. Code § 35-44.1-4-2.[5] Of interest, the Indiana General Assembly amended this separate perimeter law when it enacted the 25-foot buffer

---

[5] Under this perimeter law, an "emergency incident" includes "(1) a structure or vehicle that is on fire; (2) a motor vehicle accident; (3) an accident involving hazardous materials; (4) a crime scene; (5) a police investigation; and (6) a location where an individual is being arrested." Ind. Code § 35-44.1-4-1.5.

law at issue here. The perimeter law originally allowed a 150-foot perimeter from an emergency incident, but now limits this to the area defined by law enforcement or 25 feet from the emergency incident, whichever is greater. One might say then the State of Indiana promoted more recording—greater First Amendment access and expression—than less by amending this law while also enacting the buffer law.

Not all of what an officer lawfully does will involve a set perimeter. An officer might be engaged in her lawful duties by completing reports in her squad car, serving process, aiding an injured citizen, or enforcing traffic laws. *See, e.g., Colten*, 407 U.S. at 109 ("State has a legitimate interest in enforcing its traffic laws and its officers [are] entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction"). But not all lawful duties are so location-confined. Not all discussions with witnesses, informants, or victims will occur in a set perimeter under Indiana Code § 35-44.1-4-2, or be deemed interfered with under Indiana Code § 35-44.1-4-10.

A law enforcement officer often encounters fluid and ever-evolving circumstances that defy a set perimeter but for which a buffer around the officer would foster safety and other substantial government interests with merely nominal effects on the public's ability to record. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) (officers often face "tense, uncertain, and rapidly evolving" circumstances). Foot pursuits of a suspect, active shooter scenarios, natural disasters, assisting those with mental health challenges, and a host of circumstances might elude a set perimeter and instead be served by this buffer law by promoting safety—not just the officer's safety but the videographer's safety—with but incidental effects on the public's ability to record. *See Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972) (reporters "have no constitutional right of access to the scenes of crime or disaster when the general public is excluded").

Mr. Nicodemus has not articulated a substantial number of applications that would prove unconstitutional in light of the law's plainly legitimate sweep. *See Americans*, 141 S. Ct. at 2387; *City of Houston*, 482 U.S. at 458. In conducting this analysis, the law must be careful not to exceed the statute's facial requirements or to invite the court (or parties) to speculate about "hypothetical" or "imaginary"

S.A. 11

cases. *Wash. State Grange*, 552 U.S. at 450. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *See Bonin*, 932 F.3d at 536-37 (quoting *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). There must a "realistic danger." *Id.* Outside of a conceived impact on citizen recording, Mr. Nicodemus offers no realistic unconstitutional applications of this law. The court offered for consideration alternative hypotheticals in oral argument, but the court is convinced that none of these hypotheticals presents a realistic danger to First Amendment liberties; and should one such rare situation materialize, an as-applied challenge would serve the arrow in the aggrieved party's arsenal to address it. *See Ferber*, 458 U.S. at 773-74.

Mr. Nicodemus focuses on recording police conduct. At most this statute poses an incidental—not a substantial—effect on a First Amendment right to record it. A 25-foot buffer proves all but minor compared to the plainly legitimate sweep of cases. "When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play. On the other hand, when 'speech' and 'nonspeech' elements are combined, and the 'nonspeech' element [] triggers the legal sanction, the incidental effect on speech rights will not normally raise First Amendment concerns." *Alvarez*, 679 F.3d at 602; *accord United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). For instance, a state could punish someone for burning a flag in violation of a law against outdoor fires, whereas it could not do so in violation of a law against dishonoring the flag—the former law being directed to conduct with incidental effect on speech and the latter law being directed toward speech.[6] *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992); *Texas v. Johnson*, 491 U.S. 397, 406 (1989).

---

[6] This distinction illustrates why an Arizona law prohibiting video recording within eight feet of law enforcement might prove unconstitutional, directed toward speech as it is, but why this law, directed at conduct with incidental effect on speech, would survive. *See Ariz. Broads. Ass'n v. Brnovich*, 626 F. Supp.3d 1102, 1105-06 (D. Ariz. 2022) (applying strict scrutiny). Or illustrates why a Wisconsin law that prohibits intentional interference with hunters by barring a visual or physical proximity to them, or by approaching them (with no distance set by statute), would be problematic by removing any ability to record hunting activity. *See Brown*, 2023 U.S. App. LEXIS at 1-2, 68.

The "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) (providing examples). "Orders regulating conduct often have incidental effects on speech, but this does not require courts to treat them as if they were regulations *of* speech." *Morgan v. White*, 964 F.3d 649, 652 (7th Cir. 2020) (finding incidental burden on speech when COVID-19 social distancing order made it harder for a campaign to "round up signatures"). "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word," so long as it does not "proscribe particular conduct *because* it has expressive elements." *Johnson*, 491 U.S. at 406; *see, e.g., Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) (upholding ban on camping on the national mall as applied to demonstrators sleeping there overnight).

The buffer law gives officers the uninterrupted ability to perform their lawful duties. Never once does it permit law enforcement to stop the public's ability to record. The public retains that right—albeit from a vantage point 25 feet removed from where officers are engaged in their lawful duties. The law might have the incidental effect of preventing a recording within the 25-foot radius, but not every recording. In this day and age of enhanced technology, with zoom lenses that allow individuals to capture activity at hundreds of feet, or parabolic microphones that allow audio recording at distances well in excess of 25 feet, and with the ever-increasing capabilities of cellphones, drones, and common devices ubiquitously found in the hands of most every citizen, it seems rather strained to argue that citizens will suffer a substantial burden on their ability to record meaningfully. A 25-foot buffer, all but a common width of a two-car garage, or the length of a typical garden hose, or just small steps beyond an NBA three-point line, isn't a substantial burden on the right to record. Watchers of all sorts can still point out a foul observing from distances at 25 feet, and even greater, and can still hear a host of remarks. The times in which two things are true—that a law enforcement officer has no legitimate interest in situating a citizen 25 feet away while the citizen's recording suffers at that distance—will be scarce, not common.

In addition, for any one officer who has created a buffer of 25 feet in the engagement of his or her lawful duties, nothing forecloses a concerned citizen from selecting innumerable positions outside the 25-foot radius from the officer to record. If one vantage point provides a less than desirable recording angle in public, the citizen can move to any number of locations. Mr. Nicodemus had that same right here so long as he avoided approaching the officers. There may be an incidental impact on the proximity of police recording, but recording isn't prohibited or regulated by content. Every square inch of public space that is this short distance from a lawfully-engaged officer is fair game as an alternative location for recording. Not even the recording on July 20 suffered. Mr. Nicodemus mentions his inability to get to a separate disturbance at a house down the street, but he could have traversed other sidewalks or streets to get to another access point; indeed, he or his companion videographer mentioned just such an avenue through a nearby alley. They just chose not to use it.

Mr. Nicodemus says the right to record police activity includes the right to be close enough to have a meaningful view of police activity, and this statute burdens far more speech than necessary through arbitrary enforcement. *See Jordan*, 73 F.4th at 1169. But neither he nor any other citizen-journalist has a right to put a mic at the officer's mouth, or that of a victim, suspect, informant, arrestee, or witness, or to put a camera in their faces. Mr. Nicodemus's video also belies the difficulty in capturing activity greater than 25 feet away. Throughout the video, he easily captures events much greater than 25 feet and even the audio of officers speaking at a greater distance. Perhaps Mr. Nicodemus didn't pick up quieter conversations between the officers, but no one has the right to broadcast an entire event.[7] *See Branzburg*, 408 U.S. at 684; *Wis. Interscholastic Ath. Ass'n v. Gannett Co.*, 658 F.3d 614, 625 (7th Cir. 2011).

---

[7] In reply, Mr. Nicodemus cites the declaration of another citizen-journalist (Robert Perez) who was required to stay behind an area blocked off by tape, beyond 25 feet of an accident involving a victim. He says it was difficult to record the investigation from there. Nothing shows that this occurred under the new buffer law as opposed to the emergency incident law that establishes the right to set up a perimeter with tape as defined by law enforcement, or 25 feet from that. *See* Ind. Code. §§ 35-44.1-4-2(1), (2). This other videographer has no standing here.

Though this event didn't burden Mr. Nicodemus's First Amendment rights, such that he didn't bring an as-applied challenge today, the videos display some seeming confusion about Indiana's buffer law and Indiana's perimeter law—by both law enforcement and the observing public. This might not be unusual given that this event occurred a mere 19 days after the buffer law went into effect and the perimeter law was amended. The perimeter law's radius originates from an emergency incident or as defined by an officer, whereas the buffer law's 25 feet tees from a lawfully-engaged officer, prohibiting only a person's knowing or intentional approach of that officer after being ordered not to approach. This incident counsels careful training, and informed officers should be able to apply both the perimeter and buffer laws consistently in a manner that will help dissipate the confusion or frustration sometimes displayed during the July 20 events. But any such commotion from this summer night doesn't render this law substantially overbroad.

"Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). This law isn't directed toward speech. Exercising judicial restraint with a facial challenge frees the law from "premature interpretations" of a statute or an "unnecessary pronouncement" of a constitutional rule that extends beyond the precise facts of each situation, *United States v. Raines*, 362 U.S. 17, 22 (1960); *accord Sabri v. United States*, 541 U.S. 600, 609 (2004), thereby short-circuiting the democratic process and frustrating the People's will as expressed in laws adopted consistent with the Constitution by their duly-elected representatives, *see Wash. State Grange*, 552 U.S. at 451. Facial overbreadth is constitutionally "strong medicine," to be employed "with hesitation" and "as a last resort." *Bonin*, 932 F.3d at 536. This isn't the rare case that calls for a dose of it. No one seriously contends that, aside from the alleged impact on recording (speech), albeit modest, that instituting a buffer for law enforcement to perform their lawful duties exceeds the government's constitutional power. *See Clark*, 468 U.S. at 298-99. The court thus denies a permanent injunction—for

Mr. Nicodemus does not succeed on the merits of his facial overbreadth challenge.[8]

## CONCLUSION

Accordingly, the court DENIES Mr. Nicodemus's motion for permanent injunction [7] and GRANTS Mr. Nicodemus's motion to submit supplemental authority [34] and the State's motion for leave to file a response to the supplemental authority [35]. The court DIRECTS the clerk to enter final judgment for the City of South Bend, as defendant, and the State of Indiana, as intervenor. This order terminates the case.

The public has a First Amendment right to record police activity—a critically important right. Law enforcement officers have a right to perform their lawful duties unimpeded. Indiana's buffer law has many constitutional applications within its plainly legitimate sweep. It never once permits an officer to tell a reporter or citizen-journalist to leave altogether or to cease recording police activity. The law is directed toward encroachment on an officer's lawful duties within 25 feet. It doesn't target speech. It penalizes approaching a lawfully-engaged officer (after an order), not recording one. And at 25 feet, in measure small steps from an officer's work, this law has only an incidental effect on the public's First Amendment right to capture audio and video and otherwise to scrutinize police conduct. The court denies a permanent injunction because Indiana's buffer law is not unconstitutional by virtue of being facially overbroad. A case might be different if an officer enforces this law unconstitutionally in a particular scenario, but the court is not deciding such a case today.

SO ORDERED.

January 12, 2024                                        s/ Damon R. Leichty
                                                        Judge, United States District Court

---

[8] Consistent with the wisdom of deciding constitutional questions on their narrowest ground, *see Miller v. Downey*, 915 F.3d 460, 464 (7th Cir. 2019), the court need not address the level of constitutional scrutiny and other arguments given Mr. Nicodemus's failure to show substantial overbreadth at the start. Because the court resolves the question on the merits today, the court also need not consider whether the City of South Bend is liable as a municipality for the actions of South Bend police officers taken pursuant to state law.

**Statement of Compliance with Circuit Rule 30(d)**

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) are included within the appendix. There are no materials within the scope of Circuit Rule 30(b).

s/ <u>*Kenneth J. Falk*</u><br>Kenneth J. Falk<br>Attorney at Law