# No. 24-1099

## In the United States Court of Appeals for the Seventh Circuit

────────────

**Donald Nicodemus**,

*Plaintiff-Appellant*

*v.*

**City of South Bend, Indiana**,

*Defendant-Appellee*

*and*

**State of Indiana**,

*Intervenor/Defendant-Appellee*

────────────

On Appeal from the U.S. District Court
for the Northern District of Indiana, South Bend Division,
Case No. 3:23-cv-00744-DRR-MGG, Honorable Damon R. Leichty, District Judge

────────────

## Appellees' Brief

────────────

Joseph W. Smith, Ind. Bar No. 29663-64
Clark Johnson & Knight, Ltd.
233 East 84th Drive, Suite 301
Merrillville, IN 46410
JSmith@cjklaw.com
Phone: 219/322-0830
Fax: 219/322-0834

Matthew S. Clark, Ind. Bar No. 33712-45
Clark Johnson & Knight, Ltd.
5600 North River Road, Suite 600
Rosemont, Illinois 60018
mclark@cjklaw.com
Phone: 847/261-0700
Fax: 847/261-0714

*Attorneys for City of South Bend*

Theodore E. Rokita
Indiana Attorney General
Attorney No. 18857-49

James Bopp, Jr., Ind. Bar No. 2838-84
Joseph D. Maughon, Va. Bar No. 87799
Taylor C. Shetina, Ind. Bar. No. 37887-45
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, IN 47807
Telephone: 812/232–2434
Facsimile: 812/235-3685
jboppjr@aol.com
jmaughon@bopplaw.com
tshetina@bopplaw.com

*Attorneys for State of Indiana*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1099

Short Caption: Nicodemus v. City of South Bend

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　　State of Indiana

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　The Bopp Law Firm, P.C.

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　N/A

Attorney's Signature: s/ James Bopp, Jr.　　　　Date: 1/25/2024

Attorney's Printed Name: James Bopp, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☑　**No** ☐

Address: 1 S. Sixth St., Terre Haute, Indiana 47807

Phone Number: (812) 232-2434　　　　Fax Number: (812) 235-3685

E-Mail Address: jboppjr@aol.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1099

Short Caption: Nicodemus v. City of South Bend

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

State of Indiana

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Bopp Law Firm, P.C.

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Joseph D. Maughon    Date: 1/25/2024

Attorney's Printed Name:  Joseph D. Maughon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  1 S. Sixth St., Terre Haute, Indiana 47807

Phone Number: (812) 232-2434    Fax Number:  (812) 235-3685

E-Mail Address: jmaughon@bopplaw.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1099

Short Caption: Nicodemus v. City of South Bend

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

State of Indiana

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Bopp Law Firm, P.C.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Taylor C. Shetina    Date: 5/10/2024

Attorney's Printed Name:  Taylor C. Shetina

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  1 S. Sixth St., Terre Haute, IN 47807

Phone Number: (812) 232-2434    Fax Number:  (812) 235-3685

E-Mail Address: tshetina@bopplaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No.:   24-1099

Short Caption:   Donald Nicodemus v. City of South Bend

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

DEFENDANT-APPELLEE CITY OF SOUTH BEND, INDIANA

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

CLARK JOHNSON & KNIGHT, LTD.
233 East 84th Drive, Suite 301
Merrillville, Indiana 46410

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and                    N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:   N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:   N/A

(5)  Provide Debtor information required by FRAP 26.1(c) 1 & 2:   N/A

Attorney's Signature:   /s/ Joseph W. Smith                    Date:   May 9, 2024

Attorney's Printed Name:   JOSEPH W. SMITH, #29663-64

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes  X   No

Address:   233 East 84th Drive, Suite 301, Merrillville, Indiana 46410

Phone Number:   219-322-0830                    Fax Number:   219-322-0834

E-Mail Address:   jsmith@cjklaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No.: ___24-1099_____

Short Caption: ___Donald Nicodemus v. City of South Bend_____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

_____DEFENDANT-APPELLEE CITY OF SOUTH BEND, INDIANA_____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

CLARK JOHNSON & KNIGHT, LTD.
6300 North River Road, Suite 121
Rosemont, Illinois 60018

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and                                                    N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:   N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:   N/A

(5)  Provide Debtor information required by FRAP 26.1(c) 1 & 2:                                       N/A

---

Attorney's Signature: ___/s/ Matthew S. Clark_____        Date: __May 9, 2024_____

Attorney's Printed Name: ___MATTHEW S. CLARK, #33712-45_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes _____ No __X__

Address: _____6300 North River Road, Suite 121, Rosemont, Illinois 60018_____

Phone Number: _____847-261-0700_____        Fax Number: _____

E-Mail Address: _____mclark@cjklaw.com_____

# Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I. Statement of the facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A. Officers respond to shots fired and disturbance between Lincoln Way West occupants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B. Yelling at northeast corner of intersection, interfering with shooting investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II. Procedural history. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    I. Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II. The district court properly applied overbreadth analysis. . . . . . . . . . . . . . . . . . . 13

    III. Mr. Nicodemus does not substantively challenge the district court's determination that the Buffer Law does not affect the right to record. . . . . . . . . . . . . . . . . . . . . . . 18

        A. The Buffer Law does not permit LE to interfere with the right to record LE activity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B. *Holder* and *Houston* demonstrate why Mr. Nicodemus' argument fails. . . . . . 19

        C. Mr. Nicodemus does not substantively argue that First Amendment recording will be impaired by the Buffer Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        D. The other laws Mr. Nicodemus discusses do not preempt the Buffer Law. . . . 26

    IV. The Buffer Law does not vest Officers with unbridled discretion. . . . . . . . . . . . . 27

        A. The Buffer Law is not standardless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B. The Buffer Law is not indeterminate.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C. Mr. Nicodemus provides no reason to question the district court's
determination that the Buffer Law has standards.. . . . . . . . . . . . . . . . . . 29

D. Policy and additional Buffer Law language further limit discretion. . . . . . . . . 30

V. The Buffer Law satisfies any level of scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A. The Buffer Law is properly tailored. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B. The Buffer Law provides ample alternative avenues.    . . . . . . . . . . . . . . . 37

C. The Buffer Law satisfies strict scrutiny.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VI. Additionally and Alternatively, Plaintiff Is Not Entitled to Any Relief as to the City of
South Bend Because a Municipal Entity May Not Be Liable for the Enforcement
of State Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# Table of Authorities

*Cases*

*1st Midwest Bank v. City of Chicago*, 988 F.3d 978 (7th Cir. 2021). . . . . . . . . . . . . . . . . . . . . . 43

*ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012). . . . . . . . . . . . . . . . . 2, 11, 18, 38, 39

*Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102 (D. Ariz. 2022) . . . . . . . . . . . 24

*Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998) . . . . . . . . . 42

*Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Branzburg v. Hayes*, 408 U.S. 665 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22, 33

*Burson v. Freeman*, 504 U.S. 191 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175 (1968) . . . . . . . . . . . . . . . . . 39

*CBS Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 978 F. Supp.2d 1 (D.D.C. 2013) . . 39

*City of Houston v. Hill*, 482 U.S. 451 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 21, 27, 28

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988). . . . . . . 12, 14, 16, 27-29

*Colten v. Kentucky*, 407 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 40

*CSC v. Letter Carriers*, 413 U.S. 548 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Debernardis v. Metabolic Nutrition, Inc.*, No. 15-cv-10808, 2016 U.S. Dist. LEXIS 206531 (N.D. Ill. Dec. 6, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*DeBoer v. Village of Oak Park*, 267 F.3d 558 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 16, 34

*Dixon v. Love*, 431 U.S. 105 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*EEOC v. Wal-Mart Stores East, L.P.*, 46 F.4th 587 (7th Cir. 2022). . . . . . . . . . . . . . . . . . . . . . 41

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Frisby v. Schultz*, 487 U.S. 474 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*GEFT Outdoor, LLC v. Monroe Cty.*, 62 F.4th 321 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . 13

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hill v. Colorado*, 530 U.S. 703 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 39, 40

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*John K. Maciver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2023) . . . . . . . . 38, 39

*Katz v. United States*, 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Killinger v. Johnson*, 389 F.3d 765 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Lacy v. Cook Cty.*, 897 F.3d 847 (7th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Los Angeles County v. Humphries*, 532 U.S. 29 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Lund v. City of Rockford, Illinois*, 956 F.3d 938 (7th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . 1, 40

*MacDonald v. City of Chicago*, 243 F.3d 1021 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 34

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 28

*Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) . . . . . . . . . . 41, 42

*Parker v. Levy*, 417 U.S. 733 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Perry v. City of Chi.*, 733 F.3d 248 (7th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Price v. City of Chi.*, 915 F.3d 1107 (7th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*R.A.V. v. St. Paul*, 505 U. S. 377 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Reporters Committee for Freedom of the Press v. Rokita*, 1:23-cv-01805-JRS-MG
(S.D. Ind. Dec. 1, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ross v. Town of Austin*, 343 F.3d 915 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357 (1997). . . . . . . . . . . . . 23, 24, 37

*Shelton v. Tucker*, 364 U.S. 479 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282 (7th Cir. 2014) . . . . 15, 27

*Snyder v. King*, 745 F.3d 242 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991). . . . . . . . . 41, 42

*Telford v. Aurora Health Care, Inc.*, No. 22-3038, 2023 U.S. App. LEXIS 21753
(7th Cir. Aug. 16, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468 (1st Cir. 2005). . . . . . . . . . . . . . 31

*United States v. Crawley*, 837 F.2d 291 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Bonin*, 932 F.3d 523 (7th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 16, 31, 35-37

*Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 27

### Constitution and Statutes

IC § 35-44.1-2-14 ("Buffer Law") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

IC § 35-44.1-4-1.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IC § 35-44.1-4-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IC § 35-44.1-4-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IC § 35-44.1-3-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

U.S. Const. Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# Jurisdictional Statement

Per Cir. R. 28(b), appellees the City of South Bend and the State of Indiana state that the jurisdictional summary in the appellant's brief is complete and correct.

# Statement of the Case

The district court properly denied Plaintiff-Appellant Donald Nicodemus' ("**Mr. Nicodemus**") motion for injunctive relief. In the district court, Mr. Nicodemus, a "citizen-journalist who records the police," Brief and Short Index of Appellant ("**Opening Br.**"), ECF 13, 12, sued the City of South Bend,[1] inexplicably challenging IC § 35-44.1-2-14 ("**Buffer Law**"), which limits how far law enforcement officers ("**Officers**") may order people to stay away from them, providing that Officers may order them to stop approaching only within 25 feet. Mr. Nicodemus asked the court to enjoin the Buffer Law's enforcement despite the fact that it thereby *limits* police discretion existing under common law. In the words of the Supreme Court, Officers "[a]re entitled to enforce [the law] free from possible interference," including interference from individuals "claiming a[n] . . . interest in the transaction," and they may accordingly require individuals to "move on" without violating the First Amendment. *Colten v. Kentucky*, 407 U.S. 104, 109 (1972). This Court has also recognized this common-law discretion: Officers' "reasonable belief" that someone "might . . . obstruct[] their investigation [i]s sufficient for them to . . . ask him to move along." *Lund v. City of Rockford, Illinois*, 956 F.3d 938, 947 (7th Cir. 2020) (citation omitted). The main question, then, was whether the Buffer Law nonetheless somehow imposed significant harm against the public's right to "mak[e] . . . [a] recording,"

---

[1] The State of Indiana, by and through Indiana Attorney General Todd Rokita, shortly thereafter moved to intervene, which was granted. District Court Docket ("**D.**") 19. For convenience, this brief will refer to the City of South Bend and the State of Indiana, collectively, as "**Indiana**."

*ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012), despite the fact that it is a type of

law that *ACLU* explicitly distinguished—one "not aimed at . . . press rights as such," *id.* at 601

(citing *Branzburg v. Hayes*, 408 U.S. 665 (1972)).

Mr. Nicodemus did not demonstrate below that it did. Now, in this appeal, he skips over

the most important question—whether application of the Buffer Law can result in substantial

harm to First Amendment freedoms. Further, he fails to (**1**) meaningfully question the district

court's findings concerning the plethora of alternative avenues available under the Buffer Law

and (**2**) demonstrate that the Buffer Law is not properly tailored to the numerous substantial and

compelling interests it serves. Accordingly, this Court should affirm the district court.

## I. Statement of the facts.

### A. Officers respond to shots fired and disturbance between Lincoln Way West occupants.

On July 20, 2023, at about 12:25AM, gunshots were heard in the area of Lincoln Way

West and Brookfield Street in South Bend, Indiana.[2] Affidavit of Officer Jeffrey Veal ("**Veal**

**Aff.**"), D. 25-2, ¶ 4. South Bend Officers, including Jeffrey Veal and Nathan Stepp, responded.

*Id.*; Affidavit of Officer Nathan Stepp ("**Stepp Aff.**"), D. 25-3, ¶ 4.

Officer Veal was the crime scene technician in charge of this scene. Veal Aff., D. 25-2,

¶ 3, ¶ 6. Typically, in this capacity, the first thing he does is determine where evidence may be

found and what constitutes the crime scene. *Id.* at ¶ 6. He considered the crime scene to include

the entire intersection of Lincoln Way West and Brookfield Street. *Id.* at ¶ 7. Although he did not

---

[2]In his Complaint and in his Declaration, Mr. Nicodemus stated that Lincoln Way West is
a four-lane road, with two lanes in each direction. *See* Complaint, D. 1, 20; Declaration of
Donald Nicodemus ("**Nicodemus Dec.**"), D. 20-1, 14. This is incorrect. Lincoln Way West at
Brookfield Street is a two-lane road with a center turn lane. *See* Officer Stepp Body Camera
Video ("**Stepp Video**"), Ex. 1 to Joint Response in Opposition to Plaintiff's Motion for
Preliminary Injunction ("**PI Resp.**"), *see* D. 25-1, *passim*.

discuss this with the other law enforcement officers on-scene, the intersection was soon blocked off from traffic. *Id.*

When Officer Stepp arrived at the scene, he parked his patrol car so it was blocking westbound traffic from entering the intersection, and began to perform scene security. Stepp Aff., D. 25-3, ¶¶ 8, 10; Stepp Video at 00:33:50[3] *et seq.* Officer Stepp observed several people at the northeast corner of the intersection. Stepp Aff., D. 25-3, ¶ 11. He was keeping an eye on them so that, if any of them started to walk into the crime scene, he could stop them. Stepp Aff., D. 25-3, ¶ 11.

At approximately 12:53AM, Mr. Nicodemus was at the northeast corner of Lincoln Way West and Brookfield Street, live-streaming the investigation of shots fired. Compl., D. 1, ¶¶ 23–24; Stepp Video at 00:53:50 *et seq.* Officer Stepp was standing at the southeast corner of the intersection. Nicodemus Dec., D. 20-1, ¶ 24. About that time, there was a disturbance between occupants of 1905 Lincoln Way West and 1909 Lincoln Way West. Veal Aff., D. 25-2, ¶ 10. Several of those individuals began shouting at and threatening one another. *Id.*; Compl., D. 1, ¶ 27. This disturbance occurred as Officers were investigating the shots fired. Veal Aff., D. 25-2, ¶ 10.

Shortly after the shouting began Mr. Nicodemus and another, also appearing to be recording on a cell phone, began to walk across Brookfield Street toward the disturbance. Stepp Video at 00:54:00; Stepp Aff., D. 25-3, ¶ 15.[4] Officer Stepp ordered them to stay back. *Id.* at

---

[3]All time reference pincites for this video refer to the timestamp shown on the upper bar of the video screen.

[4]For ease of reference, this other person will be referenced herein as Mr. Nicodemus' "companion." However, it appears that Mr. Nicodemus and this other person just happened to be present and recording at the same time.

¶ 16; Video by Donald Nicodemus ("**Nicodemus Video**"), Ex. 2 to PI Resp., *see* D. 25-4, at 9:25; Stepp Video at 00:54:05.

Mr. Nicodemus omits from his Opening Brief and declaration the fact that he and his companion were walking across Brookfield and toward the scene of the disturbance when Officer Stepp ordered them to stay back. *See* Opening Br., ECF 13, 4; Nicodemus Dec., D. 20-1, ¶¶ 19–26. Instead, he suggests he was standing passively on the sidewalk at the northeast corner of the intersection when Officer Stepp ordered him back. *See* Opening Br., ECF 13, 4; Nicodemus Dec., D. 20-1, ¶ 25. This is incorrect. As shown in Officer Stepp's body camera video, Mr. Nicodemus and his companion were not standing passively on the sidewalk when Officer Stepp ordered them to stay back. Stepp Video at 00:54:00.

Mr. Nicodemus also omits important information when he states that Officer Stepp "crossed the street through which a car had just passed." Opening Br. 4 (citing Nicodemus Dec., D.20-1, ¶ 24). Although this is true, it is clear that the driver of this vehicle simply ignored the fact that the road was closed. *See* Nicodemus Video at 8:55–9:00 (Officer can be seen and heard responding with disapproval as vehicle passes); *see also id.* at 5:48–6:40 (police vehicle with lights flashing can be clearly seen on the far side of the road, indicating it is not to be driven through); Stepp. Aff., D. 25-3, ¶ 14. Indeed, Mr. Nicodemus himself recognized at the time that the car "wasn't supposed to" go through. *Id.* at 9:18–9:24 (Mr. Nicodemus states, "That car that just went through looked like it wasn't supposed to.").[5]

---

[5] Mr. Nicodemus also alleges that "cars were driving through the street between Mr. Nicodemus and the police activity," Opening Br. 5 (citing Nicodemus Dec., D. 20-1, ¶ 30), that is, Brookfield Street, Nicodemus Dec., D. 20-1, ¶ 30. But it is equally clear that this road had been blocked off. *See* Nicodemus Video at 8:51–9:10 (showing police vehicles, with lights flashing, situated across Brookfield Street or on Lincoln Way West in front of Brookfield Street so as to block Brookfield street from both ends of the intersection; also showing a police vehicle, with lights flashing, parked across Lincoln Way West where one would make a right turn onto

Officer Stepp ordered Mr. Nicodemus and his companion to stay back because he did not want them to approach Officers from behind while those Officers were addressing a potentially violent situation. Stepp Aff., D. 25-3, ¶ 16. Officer Stepp was also concerned for the safety of Mr. Nicodemus and his companion. *Id.* He was aware there had been gunfire at that location, but did not know whether the firearms had been located, whether anyone who had been involved in the gunfire was still around, or whether anyone at the scene of the disturbance was armed. *Id.* Officer Stepp's decision to order Mr. Nicodemus and his companion to stay back had nothing to do with the fact that they were recording. *Id.*

When Officer Stepp approached them and ordered them to stay back, Mr. Nicodemus and his companion responded, "Get out your tape measure or put up tape," or words to that effect. Nicodemus Video at 9:30; Stepp Video at 00:54:05. Mr. Nicodemus and his companion yelled at, berated, swore at, and threatened to sue Officer Stepp. Nicodemus Video at 9:40 *et seq.* Officer Stepp walked off what he estimated to be 25 feet from the northwest corner of the intersection and ordered them not to pass that spot. Stepp Video at 00:54:25 *et seq.*; Stepp Aff., D. 25-3, ¶ 18. This effectively required Mr. Nicodemus and his companion to return to the sidewalk they had been standing at before they started to cross Brookfield Street. *See* Stepp Video at 00:54:50.

After Officer Stepp ordered Mr. Nicodemus and his companion to stay back, Mr. Nicodemus and/or his companion continually yelled at, swore at, and threatened to sue Officer Stepp and the other Officers. Nicodemus Video at 9:35 *et seq.*; Stepp Video at 00:54:00 *et seq.*

Officer Stepp walked to the area of the disturbance, in case the situation turned violent and he was needed to assist restoring order. Stepp Aff., D. 25-3, ¶ 20; *see also* Stepp Video at 00:55:05. As he was walking to that area, Mr. Nicodemus and his companion yelled at him,

Brookfield Street).

calling him a "piece of shit" and "fucking piece of shit." Nicodemus Video at 10:25. They

proceeded to hurl additional abuse at him, calling him "fucking punk ass" and "bitch."

Nicodemus Video at 11:50.

Meanwhile, Officer Veal and other Officers were working to calm the situation at 1905

and 1909 Lincoln Way West and prevent violence. Veal Aff., D. 25-2, ¶ 10.

The Officers were eventually able to calm the disturbance at the residences. *Id.* But

tensions remained high after the shouting stopped. *Id.*

**B. Yelling at northeast corner of intersection, interfering with shooting investigation.**

Officer Veal heard yelling at the northeast corner of the intersection. Veal Aff., D. 25-2,

¶ 11. Based on its volume and tone, he could tell there was a problem. *Id.* Walking to the

intersection's northeast corner, he heard people yelling verbal abuse toward the Officers. *See*

Nicodemus Video at 12:15 *et seq.* He ordered everyone back 25 feet. Stepp Video at 00:57:05.

Mr. Nicodemus and the others at the intersection did not comply with Officer Veal's order.

Nicodemus Video at 12:25.

Officer Veal wanted everyone on the northeast corner of the intersection to move back

because their yelling and verbal abuse was interfering with the Officers' ability to investigate the

shooting incident. Veal Aff., D. 25-2, ¶13. As a crime scene technician investigating a scene,

Officer Veal is often not in a position to respond quickly during an emergency, and he relies on

the Officers providing scene security to ensure his safety. *Id.* Officer Veal was concerned that

Mr. Nicodemus and his companion were distracting Officers from their scene security duties. *Id.*

Officer Veal was aware of a past incident where crime scene technicians were nearly struck by

gunfire while an Officer providing scene security was distracted by bystanders. *Id.* Officer Veal's

decision to order everyone on the corner to move back had nothing to do with the fact that two of them were recording. *Id.*

When Officer Veal again ordered everyone to move back, Mr. Nicodemus' companion responded, "Fuck you," and Mr. Nicodemus and his companion continued to argue with Officer Veal. Stepp Video at 00:57:05 *et seq.* Officer Veal again ordered everyone to move back 25 feet, referred to the "new law," and warned everyone that they would be arrested if they did not comply. Stepp Video at 00:57:05 *et seq.* The "new law" that Officer Veal was referring to was IC § 35-44.1-2-14. *See* Veal Aff., D. 25-2, ¶ 14. That law, the Buffer Law, states: "A person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching commits unlawful encroachment on an investigation, a Class C misdemeanor."

Officer Veal ordered everyone to move back several times; they repeatedly refused to comply with these orders. Nicodemus Video at 12:30 *et seq.* Mr. Nicodemus demanded that Officer Veal show him 25 feet. *Id.*

Mr. Nicodemus' companion was particularly abusive, addressing Officer Stepp as "your fucking punk ass" and "lying motherfucker," making statements suggesting he knew where he lived, and threatening to come to his house. Stepp Video at 00:57:05 through 00:58:40.

Rather than arrest Mr. Nicodemus and the others for refusing to comply with his repeated orders to move back, Officer Veal agreed to get his tape measure. Nicodemus Video at 12:55. The tape measure readily available to him was 10 feet. Nicodemus Dec., D. 20-1, ¶ 35; Veal Aff., D. 25-2, ¶ 15. He returned to the northeast corner of the intersection and asked Mr. Nicodemus to take the end of the tape measure and move back 10 feet. Nicodemus Video at 14:10. Mr.

Nicodemus complied, but, when Officer Veal asked him to help him measure another 10 feet, responded, "Fuck you, man." *Id.* at 14:15 *et seq.* Officer Veal then pointed out a spot that appeared to be 25 feet away from the intersection, and ordered Mr. Nicodemus and the others to move back to that spot. *Id.* at 14:30. Mr. Nicodemus and the others eventually complied. *Id.* at 14:35.

Officer Veal ordered everyone at the northeast corner of the intersection to move back 25 feet, not just the people who were recording. Nicodemus Video at 14:35.

Mr. Nicodemus and his companion continued to hurl verbal abuse at the Officers, yelling at them, swearing at them, and threatening to sue them. Nicodemus Video at 14:45 through end.

South Bend police officers have increasingly experienced interference in their duties by people showing up at crime scenes and recording on cellphones or similar devices. Affidavit of Chief Timothy Lancaster ("**Lancaster Aff.**"), D. 25-5, ¶¶ 4–5, 8–11. Some people will brazenly walk into active crime scenes unless crime scene tape has been set up. *Id.* at ¶ 5.

Members of the public encroaching on police investigations present a number of safety and security concerns. *Id.* at ¶ 6. Officers cannot know the intentions of the people encroaching on the investigation. *Id.* They could be present for the purposes of victim or witness intimidation, destruction of evidence, or the commission of other crimes. *Id.* Violence can erupt at any moment, especially at scenes where tensions are high. *Id.* If violence does erupt, bystanders are more likely to be injured if they are encroaching on the scene. *Id.* If bystanders are encroaching on a scene, Officers must divide their attention between the bystanders and their scene security duties, which increases the risk to Officer safety. *Id.* Bystanders encroaching on a crime scene may inadvertently contaminate or destroy evidence. *Id.*

People recording South Bend police officers often come close enough to overhear Officers' conversations with victims and witnesses. If close enough to record Officers taking statements from victims and witnesses, the recording will very likely capture the victims' and witnesses' sensitive personal information, such as social security number and date of birth. Stepp Aff., D. 25-3, ¶ 23. Some people have recorded the computer screens inside Officers' vehicles, which often display sensitive personal information about victims, witnesses, suspects, and others. Veal Aff., D. 25-2, ¶ 18.

South Bend police officers often encounter situations where people are reluctant to give a statement because they fear retaliation. Lancaster Aff., D. 25-5, ¶ 7. South Bend police officers have experienced situations where witnesses have been reluctant to give statements because people were nearby recording. Stepp Aff., D. 25-3, ¶ 24. If victims or witnesses refuse to give a statement because they feel intimidated by someone recording what they are saying to the police, that could lead to a violent criminal remaining on the streets instead of being arrested and prosecuted. Lancaster Aff., D. 25-5, ¶ 7. If a victim or witness is recorded giving a statement to the police, the victim or witness could be subjected to reprisals for talking to the police. Stepp Aff., D. 25-3, ¶ 21.

Other St. Joseph County law enforcement ("**LE**") agencies have also experienced similar problems with people getting too close to ongoing police activities in order to record. Lancaster Aff., D. 25-5, ¶ 12.

## II. Procedural history.

Indiana largely agrees with Mr. Nicodemus' recitation of the procedural history, but adds the following.

Although Mr. Nicodemus states that he "did not argue that the [Buffer Law] was unconstitutional because of substantial overbreadth," Opening Br. 8, counsel for Mr. Nicodemus did, at trial, affirmatively respond to the district court's inquiry whether his challenge was, "in large measure, an overbreadth challenge," stating, "Exactly. The overbreadth means it has no core." Transcript of October 13, 2023 Hearing ("**Tr.**"). 19:10–13. The district court also, during the same discussion, presented the possibility that it could disagree "that this is a significant hampering of an ability to record both video and audio in this day and age." *Id.* at 21:17–19.

Concerning Mr. Perez, who submitted a declaration supporting Mr. Nicodemus' motion for preliminary injunction, *see* Opening Br. 10–11, the district court indicated his testimony was not relevant, stating, "Nothing shows that [Mr. Perez was given an order] under the [Buffer Law]," and declaring that Mr. Perez had "no standing[.]" Opinion and Order ("**Opinion**"), S.A. 14 n.7.

## Summary of the Argument

The Buffer Law does not regulate speech. It regulates conduct. As the district court found, it is "directed toward . . . encroachment," affording Officers "the uninterrupted and unimpeded ability to do their jobs, including as examples the need to investigate, secure evidence and statements, and conduct other official police business safely; and it protects the integrity of government processes as well as suspects, victims, witnesses, and other citizens interacting with law enforcement from harm," Opinion, S.A. 9, all substantial or compelling interests, *id.* at S.A. 9–11. In short, it addresses the same sort of encroachment that *Colten* and *Lund* had no trouble in finding Officers justified, under simple common-law authority, in issuing move-on orders to prevent.

While there is a First Amendment right to record LE activity, *Alvarez*, 679 F.3d 583, 595–97 (7th Cir. 2012), no court has ever held that this includes a right to do so from as near a proximity as one desires. While Mr. Nicodemus leans on numerous cases in which laws facially targeting First Amendment rights were struck down, the Buffer Law is not such a law. Nowhere in its text is speech, recording, or anything else that could be considered First Amendment conduct mentioned. *See generally* IC § 35-44.1-2-14. Instead, as the district court properly found, it is directed toward encroachment. Opinion, S.A. 9. In light of this, the district court concluded what is plainly true: "Never once does [the Buffer Law] permit law enforcement to stop the public's ability to record. The public retains that right—albeit from a vantage point 25 feet removed . . . ." Opinion, S.A. 13. A law that cannot hinder First Amendment rights cannot be used to target them. Accordingly, the district court's determination meant that it did not need to make a neutrality determination. By arguing concerning neutrality without raising significant reasons to question the district court's actual determination, Mr. Nicodemus puts the cart before the horse, largely skipping the crux of the issue. He thus leaves himself with little foundation to make his neutrality claims.

The district court recognized, of course, that the Buffer Law may have incidental First Amendment effects because, on "scarce" occasions, it might cause a "recording [to] suffer[]" despite the minimal distance it imposes. Opinion, S.A. 13. But because the "First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech," *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011), these potential minor, incidental effects did not render it subject to First Amendment scrutiny. Opinion, S.A. 13, 16. This brings to light again the chief issue with Mr. Nicodemus' argument. He provides little reason to question the district court's rationale for finding that any First Amendment effect of the Buffer Law is

merely incidental. He does not explain why the zoom lenses that exist in the phones found in nearly everyone's pocket might not be able to capture activity from a mere 25 feet away, nor what constitutional basis there might be to challenge the Buffer Law as preventing the audio-recording of private conversations. Nor do the cases he relies most heavily upon have anything to do with laws that do not facially implicate First Amendment conduct, or with the effect of a buffer zone on recording. As a result, his argument fails to gain any traction.

Nor does Mr. Nicodemus provide a persuasive basis for his argument that, at bottom, constitutes a claim that strict scrutiny must be applied to *any* law that, as a result of Officer discretion, has *any* affect (even incidental) on First Amendment conduct. That argument is wholly forestalled by clear precedent stating that, in order to be susceptible to a First Amendment challenge, such a "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759 (1988). Mr. Nicodemus provides no precedent under which a minor, incidental threat to First Amendment freedoms arising from Officer discretion may render a law subject to facial invalidation. Indeed, such threats are precisely the type of scenario that as-applied challenges are designed to address, if and when an improper use of discretion arises.

Finally, though these ample problems prevent Mr. Nicodemus' arguments from getting off the ground to begin with, he would have many remaining problems even were that not the case. The first of these additional issues is a major one: his claim that the law affords unbridled discretion is not accurate. Many more follow: he fails to show that the Buffer Law is preempted by other laws or that policies concerning its implementation (which generally prohibit interference with recording) are not relevant; he makes little attempt to refute the district court's

finding that myriad alternative avenues exist under the Buffer Law; and he does not question that

it serves numerous compelling interests. As explained below, these many problems render

unavailing both his argument that the law, because it targets First Amendment activity, is not

neutral, and all arguments that it fails scrutiny. This Court should affirm the district court's

judgment.

## Argument

### I. Standard of review.

In reviewing the a district court's determination on permanent injunctive relief, this court

"review[s] the district court's decision . . . for an abuse of discretion, though [it] conduct[s] an

independent review of any underlying legal determinations." *GEFT Outdoor, LLC v. Monroe

Cty.*, 62 F.4th 321, 326 (7th Cir. 2023). Factual determinations are reviewed for clear error. *Lacy

v. Cook Cty.*, 897 F.3d 847, 867 (7th Cir. 2018).

### II. The district court properly applied overbreadth analysis.

Mr. Nicodemus demonstrates a fundamental misapprehension of the legal criteria for

"unbridled discretion" challenges in questioning the district court's finding that the Buffer Law

"never once permits an officer to tell a reporter or citizen-journalist to leave altogether or to cease

recording police activity," "doesn't target speech," Opinion, S.A. 16, and presents only "scarce"

possibility of "a law enforcement officer ha[ving] no legitimate interest in situating a citizen 25

feet away while the citizen's recording suffers at that distance," *id.* at S.A. 13.[6] In arguing that the

district court failed to analyze his claim that the Buffer Law targeted First Amendment activity

---

[6]Mr. Nicodemus claims that this statement meant the district court "dismissed the likelihood of law enforcement" misusing this law. Opening Br. 24 n.5. This misreads what the court said, which is simply that *if* the Buffer Law is used when there is no legitimate interest in doing so, such use is unlikely to coincide with the already-unlikely event that recording will be impeded at 25 feet.

due to unbridled discretion, he simply skips over these key elements of that court's determination, which, in short, constituted a determination that the Buffer Law's 25-foot buffer can have little effect on the First Amendment right to record. That being the case, Mr. Nicodemus *could not* (and cannot) prevail on his unbridled discretion claim unless he gives reason to question the court's overarching determination, since unbridled discretion is problematic only if it can affect First Amendment activity. As discussed below, he fails to provide such a reason. Accordingly, though he makes much of the district court's declining to reach his neutrality arguments, the district court's decision to decide these "constitutional questions on their narrowest ground," Opinion, S.A. 16 n.8, was proper.

Courts will not facially invalidate a law that is only rarely susceptible to First Amendment abuse. *See Parker v. Levy*, 417 U.S. 733, 760 (1974). Accordingly, even when a law vests Officers with unbridled discretion, the question that must be answered first is whether that discretion can have a meaningful impact on those freedoms. Indeed, *City of Lakewood*, a seminal "unbridled discretion" case upon which Mr. Nicodemus relies heavily, makes this clear. In order for a statute to be struck down on unbridled discretion grounds, it must threaten First Amendment freedoms "to a significant degree," 486 U.S. at 759. The *Lakewood* Court was careful to be clear that this doctrine does *not* mean "that the press . . . may challenge as censorship any law involving discretion . . . "; instead, "[t]he law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* A "substantial threat" in the facial invalidation context means a threat that is "substantial . . . , judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

Accordingly, to succeed in the district court, Mr. Nicodemus needed to show a threat of such substantiality. He failed to do so, and now, rather than centering his appeal on doing so, he simply claims that the court—by recognizing the import of this overbreadth doctrine and deciding the case "on [its] narrowest ground," Opinion, S.A. 16 n.8—failed to consider his arguments. Thus, as further shown below, Mr. Nicodemus does not persuasively question the district court's determinations.

This is not changed by Mr. Nicodemus' observation that this Court has, in some cases, tied unbridled discretion to content neutrality, Opening Br. 21 (citing *Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014)[7]). It remains true that claims that regulations target First Amendment activity can succeed only if they demonstrate the existence of a "*significant* danger of . . . discrimination[.]" *Reed v. Town of Gilbert*, 576 U.S. 155, 178 (2015) (Alito, J., joined by Kennedy and Sotomayor, JJ., concurring) (quoting *R.A.V. v. St. Paul*, 505 U. S. 377, 388 (1992)). And this Court continues, when appropriate, to analyze claims of unbridled discretion using overbreadth analysis, rather than neutrality analysis, *e.g.*, *Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023)[8], consistent with the Supreme Court's guidance, *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (noting that the Court permits "overbreadth" challenges "in cases where every application creates an impermissible risk

---

[7]*Smith* resulted in remand on as-applied grounds, 742 F.3d at 290, and is for that reason further inapplicable in this facial challenge.

[8]This also renders Mr. Nicodemus' point that *Kemp* "recognized that a statute prohibiting, among other things, 'approaching' hunters to record their activities, implicated the First Amendment," Opening Br. 14 (citation omitted), unhelpful to his argument: the statute there *specifically targeted* recording, and this Court observed that the defendants could not advance any "hypothetical scenario in which" that clause "would have any effect other than to chill First Amendment activities." 86 F.4th at 778. This rendered the clause overbroad. *Id.* In contrast, the Buffer Law plainly does not target any First Amendment activity, as further explained below.

of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker").

Nor do the facial challenge cases cited by Mr. Nicodemus striking down laws due to non-neutrality as a result of unbridled discretion change this, as they uniformly involve laws that were plainly, on their face, directed against speech. In *Lakewood*, the Court found that "the licensing system at issue" was "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." 486 U.S. at 760. In *Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*, the resolution at issue stated that the airport was "not open for First Amendment activities" and directed the city attorney to litigate against anyone who "engage[d] in First Amendment activities" there. 482 U.S. 569, 570–71 (1987). *City of Houston v. Hill*, contrary to Mr. Nicodemus' assertion that the "statute certainly applied to non-expressive conduct," Opening Br. 17, concerned an ordinance that constituted *only* "a general prohibition of speech." 482 U.S. 451, 468 (1987); *see also infra* Part III.B. *Minnesota Voters Alliance v. Mansky* concerned an election statute that, by its plain terms and the state's own interpretation, was limited to a direct ban on "words and symbols" with certain messages, including apparel. 585 U.S. 1, 17 (2018). And *DeBoer v. Village of Oak Park* concerned a "use policy" for a "public forums" held in the municipal complex's conference rooms, 267 F.3d 558, 561–62 (7th Cir. 2001), thus falling within the classic rubric of a "regulation[] . . . that 'ves[t] unbridled discretion in a government official over whether to permit or deny *expressive activity*,'" *Ward v. Rock Against Racism*, 491 U.S. 781, 793 (1989) (quoting *Lakewood*, 486 U.S. at 755) (emphasis added).

It is plain that a statute facially directed against speech *and* vesting enforcement authorities with unbridled discretion will almost always meet the threshold test of a substantial

threat of First Amendment harm.  However, that is decidedly *not* the case when a statute addresses conduct rather than speech:

> [E]ven if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the "remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct." . . . "[W]here conduct and not merely speech is involved" the overbreadth must "not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."

*Parker*, 417 U.S. at 760 (cleaned up) (citing *CSC v. Letter Carriers*, 413 U.S. 548, 580–81 (1973); *Broadrick*, 413 U.S. at 615). The Buffer Law does not vest Officers with unbridled discretion, *infra*, but regardless, it cannot be the case that a statute vesting discretion that may only lead to First Amendment discrimination in a small fraction of its *applications* should be *facially* invalidated. Mr. Nicodemus, failing to recognize this, largely omits the crucial first step of the argument he must make.

Nor can there be any doubt that the district court carefully considered whether the discretion afforded by the Buffer Law did, in fact, create a substantial risk of First Amendment harms. "The court offered for consideration alternative hypotheticals in oral argument, but the court [wa]s convinced that none of these hypotheticals presents a realistic danger to First Amendment liberties; and should one such rare situation materialize, an as-applied challenge would serve . . . to address it." Opinion, S.A. 12; *see also, e.g.*, Tr. 29:8–16, 31:10–18, 32:16–33:2 (the court offers various hypotheticals). The district court considered the proper question and came to a conclusion that, as further discussed below, Mr. Nicodemus does not sufficiently challenge. The district court's decision should be affirmed.

**III. Mr. Nicodemus does not substantively challenge the district court's determination that the Buffer Law does not affect the right to record.**

**A. The Buffer Law does not permit LE to interfere with the right to record LE activity.**

Mr. Nicodemus' arguments that the Buffer Law targets First Amendment activity are largely irrelevant since they are precluded by the inadequately-challenged district court determination that the Buffer Law does not substantially affect First Amendment activity. The district court stated, "Never once does [the Buffer Law] permit law enforcement to stop the public's ability to record. The public retains that right . . . ." Opinion, S.A. 13. If a law does not *affect* First Amendment activity, it obviously *cannot* be applied based on the content or viewpoint of such activity. While Mr. Nicodemus states, "The district court . . . erroneously concluded that [the Buffer Law] imposes only an incidental burden on expression," Opening Br. 9, he develops this argument minimally and unpersuasively, leaving little room to doubt the district court's conclusion.

First, he observes that "'[w]hen the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play.'" *Id.* at 16 (quoting *Alvarez*, 679 F.3d at 602). Far from helping Mr. Nicodemus' argument, this is the very reason his argument *fails*. While he claims that "[t]he restriction on the expressive activities of Mr. Nicodemus and other citizen-journalists is therefore not incidental, but at the very core of the challenged statute," *id.*, he offers no statutory language or rubric of construction showing that any expressive activity is what triggers the Buffer Law.

This is because he cannot do so. Indeed, he concedes that it is constitutionally permissible to prevent "persons . . . from getting too close to law enforcement activity if doing so would interfere with the police," *id.* at 9; *see also id.* at 13, that the Buffer Law "may be applied to

non-expressive conduct," *id.* at 10, and that "'the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech,'" *id.* at 16 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011)). He also explicitly disclaims any argument that the Buffer Law directly regulates recording at all, stating that his claim is only that it may affect First Amendment activity "by allowing [journalists] to be pushed back to distances from which they cannot effectively" record, *id.* at 17. Yet, as further discussed below, he does not adequately challenge the district court's factual findings (which are subject to review only for clear error, *supra* Standard of Review) that "[i]n this day and age of enhanced technology . . . ubiquitously found in the hands of most every citizen, it" is unlikely that "citizens will suffer a substantial burden on their ability to record meaningfully" by being removed 25 feet, Opinion, S.A. 13. Without adequately challenging the *factual* grounding for the district court's conclusion that the Buffer Law does not regulate the right to record, Mr. Nicodemus is left with no basis to conclude that the Buffer Law *does* affect that right.

**B. *Holder* and *Houston* demonstrate why Mr. Nicodemus' argument fails.**

Mr. Nicodemus cites numerous cases in an attempt to show that the Buffer Law should be treated the same as laws that have been struck down as facially targeting First Amendment activity, but they show only how distinct this case is from those. For example, he states, "The restriction on the expressive activities of Mr. Nicodemus and other citizen-journalists is . . . at the very core of the challenged statute," claiming that this renders the Buffer Law "no different than the situation presented in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)." *Id.* at 16. But as he recognizes, the *Holder* Court found that the law at issue there ("**§ 2339B**")—which prohibited providing support to foreign terrorist organizations, 561 U.S. at 7—could "'be described as directed at *conduct* . . . but *as applied* to plaintiffs the conduct triggering coverage

under the statute consists of communicating a message,' thereby demanding exacting scrutiny." Opening Br. at 17 (quoting 561 U.S. at 28) (emphasis added).[9] *Holder* shows precisely why Mr. Nicodemus' position fails: Mr. Nicodemus' challenge is facial, not as-applied. Just as in *Holder*, the numerous compelling interests served by the Buffer Law, Opinion, S.A. 9–11, render the law facially constitutional.

Specifically, *Holder* found "that, in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, § 2339B does *not* violate the freedom of speech." 561 U.S. at 39 (emphasis added). So, not only did the Court find, as Mr. Nicodemus himself states, that the law under consideration was aimed at conduct and not at speech, Opening Br. 17—it was also clear that *even* as applied to the plaintiffs' intended speech, it was *still* constitutional. Mr. Nicodemus has not even *raised* an as-applied challenge to the law that he says is "no different" than that at issue in *Holder*, Opening Br. 16. Accordingly, by admitting that the situation here is the same as that in *Holder*—especially in light of his declining to make an as-applied challenge, like the *Holder* plaintiffs had (and *still* failed)—Mr. Nicodemus ultimately concedes that the district court's determination was correct.

Similarly, *Houston* serves better to show the gaps in Mr. Nicodemus' argument than to aid it. *Houston* concerned an ordinance prohibiting "any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty . . . ." 481 U.S. at 455 (citation omitted). However, the government had *conceded* that criminalization of

---

[9]As this quote and others show, there can be little question that the Court construed the *Holder* plaintiffs' claims to be as-applied challenges. *E.g.*, 561 U.S. at 8 ("Plaintiffs claim . . . that *applying* [§ 2339B] to prevent them from doing so violates the Constitution. . . . We conclude that [§ 2339B] is constitutional *as applied* to the particular activities plaintiffs have told us they wish to pursue"), 25 ("We . . . consider whether [§ 2339B], *as applied* to plaintiffs, violates the freedom of speech . . . .") (all emphases added).

"any species of physical assault on a police officer" was preempted by the state code, *id.* at 460

(citation omitted), thus leaving the enforceable portion only "a general prohibition of speech"

with "'no core' of constitutionally unprotected expression to which it might be limited," *id.* at

468 (citation omitted).[10] Accordingly, Mr. Nicodemus is incorrect to claim that the ordinance

"certainly applied to non-expressive conduct." Opening Br. 17. The Court found precisely the

opposite. *Houston*, 482 U.S. at 479 (Powell, J., joined by O'Connor and Scalia, JJ., dissenting)

("I cannot agree with the Court that this ordinance punishes only speech."). The Buffer Law

plainly regulates conduct, not speech, so Mr. Nicodemus' comparison to *Houston* is inapposite.

Furthermore, to the extent the Buffer Law *might* affect First Amendment conduct, it does

so only incidentally, as the district court found. Opinion, S.A. 14, 16. Accordingly, Indiana has

made no regulates-speech-only concession, which renders this case entirely different than

*Houston*. Mr. Nicodemus is therefore left with no basis to claim that the Buffer Law has more

than an incidental effect on speech. As shown below, his attempts to show that the Buffer Law

*does* primarily regulate speech (either by arguing that its regulation of conduct is preempted, or

that it otherwise primarily affects First Amendment conduct) fail.

## C. Mr. Nicodemus does not substantively argue that First Amendment recording will be impaired by the Buffer Law.

Because the cases Mr. Nicodemus relies on as analogous are the antithesis of the case at

bar, he must show otherwise show that the Buffer Law has a significant effect on First

Amendment activity. He does not.

---

[10] *See also id.* at 461 ("the enforceable portion of the ordinance . . . prohibits verbal interruptions of police officers"), 461 n.9 (noting that the appellate court had "assumed that the ordinance prohibited physical as well as verbal assaults" but, due to the city's concession that physical assaults were preempted, the Court did not need to undertake an analysis of "the ordinance, if not partially pre-empted").

First, Mr. Nicodemus claims that the Buffer Law "allow[s] [journalists] to be pushed back to distances from which they cannot effectively" record, arguing that this violates the principle that  the First Amendment "protects the ability to approach the police as this is 'essential to carry out plaintiff['s] protected monitoring and recording.'" Opening Br. 17 (citing *Kemp*, 86 F.4th at 779). But he fails to show *how* the Buffer Law might prevent effective expression. To do so, he needed to address the district court's finding that the Buffer Law "might have the incidental effect of preventing a recording within the 25-foot radius, but not every recording." Opinion, S.A. 13. As this finding reminds us, the question in a facial challenge is not whether there are *no* potential applications of the Buffer Law which might prevent recording LE, but whether such applications result in a substantial risk of hindering First Amendment activity. The district court concluded that they did not.

The court made myriad *factual* findings supporting this conclusion. It found that technology "in the hands of most every citizen" allow them, ordinarily, to "record meaningfully" from 25 feet away. Opinion, S.A. 13. It noted that 25 feet is "a common width of a two-car garage, or the length of a typical garden hose, or just small steps beyond an NBA three-point line," and that "[w]atchers of all sorts can still point out a foul observing from distances at 25 feet, and even greater, and can still hear a host of remarks." *Id.* It found that even when the Buffer Law is invoked, the citizen may still select from "innumerable positions outside the 25-foot radius," "can move to any number of locations." *Id.* at S.A. 14. The availability and capabilities of technology, how well sights and sounds can be perceived from commonly-known 25-foot lengths, and the availability of varying vantage points in a given municipality are *factual* findings, entitled to great deference.

In the face of these numerous findings, Mr. Nicodemus' only objection is that citizen bystanders who choose to record LE "will not run home to grab parabolic microphones, zoom lenses, or drones[.]" Opening Br. 19. But the "zoom lenses" referenced by the district court are built into the same cell phones it described as being "ubiquitously found in the hands of most every citizen." Opinion, S.A. 13. As far as specialized microphones and drones, Mr. Nicodemus does nothing to challenge the district court's finding that a need for anything more than cell phones to record LE activity—at the same time "a law enforcement officer has no legitimate interest in situating a citizen 25 feet away"—would be "scarce, not common." *Id.*; *see generally* Opening Br. (providing no counter-argument about how common such situations might be).[11]

Mr. Nicodemus' arguments focusing specifically on the audio aspect of recording fare no better. First, he does not substantively address the district court's distinction between public and private conversations. The district court found that journalists do not have "a right to put a mic at [an] officer's mouth, or that of a victim, suspect, informant, arrestee, or witness . . . ." Opinion, S.A. 14. The court also noted the many privacy rights implicated by recording such conversations and the fact that the Buffer Law protects these rights. *Id.* at S.A. 9–10. Mr. Nicodemus, however, focuses on rights associated not with *recording* the conversations of *others* at all—much less private conversations—but on rights associated with simply engaging in one's *own*, *public* conversations. He cites *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 364, 377 (1997), claiming that 15 feet is "is beyond 'a normal conversational distance.'" Opening Br. 19. But this was not an abstract conclusion, but one closely tied to the facts. The Court found that, in

---

[11]Mr. Nicodemus asserts, "Any argument that the challenged law will have only an incidental burden . . . because only a few persons approaching the police will be journalists . . . ignores the realities of the 21st century." Opening Br. 18. It is difficult to understand how this advances his argument, since it only underscores the district court's finding that most citizens have powerful recording technology in their pockets at all times.

the abstract, a protestor who wished to converse could "maintain[] an *acceptable* conversational distance to [an] individual," compliant with the law, by "mov[ing] as the individual moves, maintaining 15 feet of separation." 519 U.S. at 377–78 (emphasis added). But because a number of factors unrelated to whether a conversation could *theoretically* be had at 15 feet—such as the width of sidewalks and the presence of other people whom the protestor would have to avoid— the court found the law unconstitutional. *Id.* In short, not only did *Schenk* have nothing to do with recording others' conversations, but it did not even find the distance at issue problematic in and of itself. *Schenk* therefore does nothing to fortify Mr. Nicodemus' position.

Mr. Nicodemus also cites *Glik v. Cunniffe*, 655 F.3d 78, 80 (1st Cir. 2011), in which the plaintiff was charged with violation of a wiretap statute after recording police from 10 feet away, but the purpose for which this out-of-circuit case is cited is unclear. *See* Opening Br. 19. No one questioned in *Glik* that the plaintiff was able to capture the audio he wished to capture, nor did the case concern any law that imposed such a distance. *See generally* 655 F.3d 78. This reference to *Glik* is fruitless.

The same is true of Mr. Nicodemus' citation of *Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102, 1105 (D. Ariz. 2022). *See* Opening Br. 14. That case is inapposite for at least three reasons. First, as in *Glik*, the case does not even discuss the import of the buffer distance. *See generally* 626 F. Supp. 3d 1102. Second, the law at issue there stated on its face that "video recording" of police activity within eight feet was prohibited, *id.* at 1105, rendering it plainly different from the content-neutral Buffer Law. Third, all defendants in the case filed either a "Notice of Non-Opposition" or "a Notice Asserting their Status as Nominal Defendants, taking no position on Plaintiff's Motion" for a preliminary injunction. *Id.* at 1104. *Brnovich* sheds no light on the issues presented in this appeal.

Finally, Mr. Nicodemus alludes to declarations submitted by himself and Mr. Perez, alleging that the Buffer Law's 25-foot zone "may make it difficult, if not impossible, to create recordings that allow viewers to see and hear what is happening." Opening Br. 20 (citations omitted). Mr. Perez's declaration is not properly before this Court.[12] Regardless of that, such a conclusory statement is no substitute for substantive argument in the face of the evidence the district court considered and the legal standards it properly analyzed. Furthermore, assertions that the Buffer Law "may" sometimes make it difficult to capture LE activity avoid the question, which is whether it will have a *substantial* effect on First Amendment activity. Accordingly, this assertion again fails to adequately challenge the district court's finding that the times in which a recording will suffer from a distance of 25 feet and there is no legitimate reason to invoke the Buffer Law would be "scarce." Opinion, S.A. 13. And even if such a declaration *did* address that question, a problem remains: the district court questioned the credibility of the declaration's assertion. The court stated, "Mr. Nicodemus's video also belies the difficulty in capturing activity greater than 25 feet away. Throughout the video, he easily captures events much greater than 25 feet and even the audio of officers speaking at a greater distance." Opinion, S.A. 14.

In sum, Mr. Nicodemus provides (**1**) no reason to question the district court's finding that ubiquitous technology permits recording that does not suffer at 25 feet away; (**2**) no reason to question the district court's finding that, in the great majority of cases in which the Buffer Law

---

[12]The district court determined that Mr. Perez had no standing and indicated his declaration was not relevant, stating, "Nothing shows that this occurred under the new buffer law as opposed to the emergency incident law" Opinion, S.A. 14 n.7. "This [C]ourt reviews a district court's evidentiary rulings for abuse of discretion. We will reverse only if no reasonable person would agree with the trial court's ruling and the error likely affected the outcome of the trial." *Perry v. City of Chi.*, 733 F.3d 248, 252 (7th Cir. 2013) (citations omitted). Mr. Nicodemus has not argued that the district court's ruling on Mr. Perez' declaration affected the outcome of the trial, nor could he, since the district court's reasoning for finding Mr. Nicodemus' declaration unpersuasive would have applied equally to Mr. Perez' declaration.

might be applied, such technology will be all that is needed; and (**3**) no cases counseling different conclusions. Accordingly, he has no basis on which to challenge the district court's conclusion that the Buffer Law does not substantially affect First Amendment activity.

**D. The other laws Mr. Nicodemus discusses do not preempt the Buffer Law.**

Mr. Nicodemus also argues briefly that other Indiana statutes adequately cover all non-First Amendment conduct that might be covered by the Buffer Law, but does not even acknowledge the district court's determinations on that front, much less attempt to refute them. Specifically, he notes "a statute . . . allow[ing] persons to be kept away from areas where there are emergencies." Opening Br. 18 (citing IC §§ 35-44.1-4-1.5, 2, 5 ("**emergency incident law**")). Of the emergency incident law, under which LE may establish a set perimeter, the district court stated, "Not all of what an officer lawfully does will involve a set perimeter." Opinion, S.A. 11. The district court reasoned that the "fluid and ever-evolving circumstances" Officers daily encounter "defy a set perimeter[.]" *Id.* However, "a buffer around the officer" in these situations

> would foster safety and other substantial government interests with merely nominal effects on the public's ability to record. . . . Foot pursuits of a suspect, active shooter scenarios, natural disasters, assisting those with mental health challenges, and a host of circumstances might elude a set perimeter and instead be served by this buffer law by promoting safety—not just the officer's safety but the videographer's safety—with but incidental effects on the public's ability to record.

*Id.*

Because Mr. Nicodemus does not back up his implication that the Buffer Law does *not* serve *these* purposes, he is left without any basis for his claim that its *actual* purpose "is to prevent persons from getting close enough to observe . . . ," Opening Br. 18.

Mr. Nicodemus also refers to IC § 35-44.1-3-1, which prohibits "knowingly or intentionally . . . forcibly resist[ing], obstruct[ing], or interfer[ing]." Opening Br. 18. But public

safety does not hinge on "interference." A person's presence near a dangerous scene might not interfere with LEOs addressing it, but that does not negate the need to ensure that person's safety. Similarly, a person close enough to record a conversation between LE and a witness might not interfere with the conversation, but that does not negate the need to preserve the witness's privacy rights. Mr. Nicodemus says nothing to refute the fact that the Buffer Law therefore furthers compelling state interests that IC § 35-44.1-3-1 does not cover. Accordingly, the existence of IC § 35-44.1-3-1 serves only to show that the Buffer Law covers gaps in existing law, quite the opposite of Mr. Nicodemus' unsubstantiated contention.

In short, Mr. Nicodemus gives no reason to doubt the district court's conclusion that application of the Buffer Law does not substantially affect First Amendment rights. Accordingly, this Court should affirm the district court's judgment.

### IV. The Buffer Law does not vest Officers with unbridled discretion.

Because Mr. Nicodemus fails to adequately challenge the district court's finding that the Buffer Law does not substantially affect First Amendment activity, this Court need not reach his argument that it affords unbridled discretion. Unbridled discretion is problematic in the First Amendment context because it "can lead to discriminatory enforcement"—that is, enforcement that targets First Amendment conduct. *Smith*, 742 F.3d at 289 (citations omitted). As the district court recognized, *see* Opinion, S.A. 13, if a statute lacks a sufficient nexus to First Amendment activity, then discretion cannot present a First Amendment problem. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002) (quoting *Lakewood*, 486 U.S. at 759) (to be non-neutral due to unfettered discretion, the law itself must have "a 'close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship . . . .'"); *see also Houston*, 482 U.S. at 467 (statute provided

"unconstitutional discretion" because it was "susceptible of regular application to protected expression."). Indeed, this fact is inherent in the cases Mr. Nicodemus cites. *Minnesota Voters Alliance*, 585 U.S. at 11, for example, *see* Opening Br. 22, concerned a law that "plainly restrict[ed]" certain "political" "form[s] of expression." And as discussed, in *Houston*, *see id.*, following the government's concession, the Court construed the statute at issue as covering *only* speech. It is plain that a First Amendment claim based on unbridled discretion cannot stand where that discretion will rarely affect First Amendment activity, as here.

However, should this Court reach the issue, Mr. Nicodemus' unbridled discretion argument fails nonetheless.

**A. The Buffer Law is not standardless.**

Simply put, the Buffer Law does have standards that prevent unbridled discretion. The sort of standards a law must contain in order to properly limit discretion are those that prevent officials from having total authority "over whether to permit or deny expressive activity," *Lakewood*, 486 U.S. at 755, and prevent the law from being "indeterminate," *see Minn. Voters All.*, 585 U.S. at 4. As explained below, the Buffer Law meets these criteria.

**B. The Buffer Law is not indeterminate.**

Part III, *supra*, discusses the fact that the Buffer Law, in general, does not permit LE to deny First Amendment activity, and more specific restrictions on such discretion are discussed below, *infra* Parts IV.C–D. Regarding indeterminacy, which is a product of terminology susceptible to varying definitions, *Minn. Voters All.*, 585 U.S. at 3–4, Mr. Nicodemus declined to make a vagueness challenge, Opinion, S.A. 7 n.4, and has not otherwise argued that any indeterminate language plagues the Buffer Law, *see generally* Opening Br. The closest he comes to such an argument is asserting that he was subject to two instances of Buffer Law orders, by

different Officers. *Id.* at 23. But this ignores an important finding of fact: it was only after a *second* disturbance occurred that the second Officer (Officer Veal) told Mr. Nicodemus to move back farther than the initial Officer had ordered. Opinion, S.A. 4–5; *see also id.* at S.A. 3–4 (describing first disturbance and order). The Buffer Law's 25-foot buffer will generally relate to the origin of a disturbance. It is also plain that different disturbances might occur in close temporal proximity and nearby to one-another, thus requiring more than one Buffer Law order. Mr. Nicodemus does not argue otherwise. Accordingly, his observation that that is precisely what occurred in this case has no relevance to whether the law is standardless.[13]

## C. Mr. Nicodemus provides no reason to question the district court's determination that the Buffer Law has standards.

The district court found that the Buffer Law's criminalization of "knowing encroachment into a zone of integrity that facilitates the performance of an officer's duties, and only then the officer's lawful duties, and only after the officer has advised the person to cease approaching, and only then within 25 feet" were "standards built within the law." Opinion, S.A. 8. And it is plain that these standards hem in Officers' authority "over whether to permit or deny expressive activity," *Lakewood*, 486 U.S. at 755. Mr. Nicodemus, however, retorts, "The requirement of being 'lawfully engaged' just means that an officer is on duty, which could mean walking down a sidewalk on the way to lunch." Opening Br. 23. It suffices to say that this strains credulity: it is difficult to imagine that a court might construe going to get lunch as a *duty* of LE. And the

_____

[13]The district court also noted that "the [B]uffer [L]aw's 25 feet tees from a lawfully-engaged officer, prohibiting only a person's knowing or intentional approach of that officer after being ordered not to approach." Opinion, S.A. 15. Mr. Nicodemus does not dispute that this is how the Buffer Law works, nor does he dispute that two Officers in slightly different locations may both need (perhaps for different purposes), a "zone of integrity," *id.* at S.A. 8, that "ensur[es] that someone at a close distance cannot harm or hinder" lawfully-engaged Officers, *id.* at S.A. 9. In sum, Mr. Nicodemus fails to show how these facts advance his argument.

requirement that Officers actually be engaged in lawful duties *does* limit discretion, *preventing* precisely the lunchtime scenario Mr. Nicodemus claims it *permits*, and tying the Buffer Law to its purpose of protecting Officers and citizens during the dangerous or private scenarios that Officer duties virtually always entail.

Mr. Nicodemus also claims that "requiring that persons be informed that they move back before being arrested for failing to do so is similarly not a standard that constrains an officer[.]" *Id.* But it is difficult to see how it does not constrain. A prior warning is not required before murder can be a crime, or theft, or kidnaping. Yet, under the Buffer Law, such a warning *is* required. The Buffer Law does not permit punishment for being within 25 feet of an Officer—whether recording or not—unless an order has been issued. That plainly constrains Officers, requiring that they permit individuals to relocate—to any of the countless alternative avenues comprising "[e]very square inch of public space that is this short distance from a lawfully-engaged officer," Opinion, S.A. 14—before charging someone with violating the Buffer Law.

**D. Policy and additional Buffer Law language further limit discretion.**

Mr. Nicodemus claims that the "Buffer Law permits an individual officer to make the determination of whether . . . expressive conduct can occur . . . for any [] reason, or no reason at all, even if there would be no . . . harm if the observer were closer than 25 feet . . . ." Opening Br. 24. But, beyond the standards addressed above, Officer discretion under the Buffer Law is limited in at least two more ways.

First, the South Bend Police Department ("**SBPD**") and other Indiana LE agencies have policies directly on point. SBPD Policy 425.2 states, "[SBPD] recognizes the right of persons to lawfully record members of this department who are performing their official duties. Members of

this department will not prohibit or intentionally interfere with such lawful recordings. . . ."[14] SBPD Policy Manual, D. 25-7. Such policies cannot be ignored. In analyzing for unbridled discretion, courts look beyond the law itself: "[a]dministrative interpretation and implementation" are "highly relevant" in facial challenges to state law, as federal courts "must consider any limiting construction" an "enforcement agency" has. *Ward*, 491 U.S. at 795–96 (cleaned up; citations omitted). The *Ward* Court found that discretion was properly limited by the city's "interpret[ation]," "policy," "practice," and "goal" with respect to the challenged regulation. *Id.* at 795.

Other Indiana LE agencies have similar policies. For example, as shown in a similar case concerning the Buffer Law, the Marion County Sheriff's Office ("**MCSO**") prohibits Officers from "interfer[ing] with the recording of [LE] activities," resolving the issue. MCSO Training Academy, Recording Police Activity, Defs.' Ex. E, Dkt. 26-6, *Reporters Committee for Freedom of the Press v. Rokita*, 1:23-cv-01805-JRS-MG (S.D. Ind. Dec. 1, 2023).[15] Such policies exist throughout the nation. *E.g.*, Dr. Richard Celeste, Expert Report, Police Practices and Procedures Analysis Regarding Indiana Code § 35- 44.1-2-14, Celeste Decl. Ex. A, D. 25-6, 18 (same policy in New Jersey). The fact that the LE agencies of both municipalities that have been sued

---

[14]SBPD's policy also recognizes that interference with the legal duties of Officers occurs when citizens are "so close to [police] activity as to present a clear safety hazard to the officers" or "as to interfere with an officer's effective communication with a suspect or witness," SBPD Policy Manual, Ex. 3 to PI Resp., D. 25-7, Policy 425.3(b)(3)–(4), and does not permit individuals recording police activity to "present an undue safety risk to the officer, him/herself or others," *Id.* at Policy 425.3(c). This only evinces further the *removal* of discretion entailed by the Buffer Law: it removes discretion from Officers in determining what it means to be *too* "close."

[15]Judicial notice of governmental records is appropriate under Federal Rule of Evidence 201. *Telford v. Aurora Health Care, Inc.*, No. 22-3038, 2023 U.S. App. LEXIS 21753, at *3 (7th Cir. Aug. 16, 2023); *see also, e.g.*, *Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *Debernardis v. Metabolic Nutrition, Inc.*, No. 15-cv-10808, 2016 U.S. Dist. LEXIS 206531, at *8 n.2 (N.D. Ill. Dec. 6, 2016).

concerning this law have them suggests most in Indiana do too. Mr. Nicodemus fails to account for these policies, which remove all discretion to discriminate against the press, further demonstrating the frail ground on which his unbridled discretion argument stands.

Second, Mr. Nicodemus provides no reason to doubt that Officers construe the Buffer Law as enforceable only during investigations (the most likely construction, since the violation is called "unlawful encroachment on an investigation," IC § 35-44.1-2-14), another limit on discretion.

Nor do Mr. Nicodemus' further arguments from the facts show otherwise. Attempting to prove that the Buffer Law is susceptible to law enforcement favoring those who are not exercising First Amendment rights, Mr. Nicodemus alleges that although he was directed back, others ("those passing by in vehicles") were permitted to enter that same area. Opening Br. 24–25. Once more, this omits and ignores essential findings of fact. Only *one* vehicle, a "semitruck," was permitted to go through, and the district court noted that "Officer Stepp said . . . he was told by another officer that he could allow [it] to pull through." Opinion, S.A. 4 n.3. While the reasoning for this is left unsaid, it is plain that turning a semitruck around is not something that can simply be done on command in the middle of the road. Nor does a vehicle passively driving down the road present the same type of crime scene-preservation and safety concerns as individuals creating a disturbance and intentionally trying to enter a crime scene where a shooting just occurred, distracting Officers from their duties. The fact that it was *only* this semitruck that was permitted to go through, while the Officer "directed several vehicles away," and only one other vehicle went through, "errantly[,] . . . despite the presence of police cars blocking the road," *id.*, further demonstrates that the semitruck proves nothing of discrimination. If anything, the Officers' control of traffic (not likely to be a great font of

recording activity—it is unlikely that many of the drivers were attempting to video-record while operating their vehicles) shows the *opposite*: equal enforcement of the law as to "press" and "non-press" alike.[16]

Mr. Nicodemus' further citation to *Kemp* is also misplaced. While he fails to establish any firm argument that the Buffer Law permits "'arbitrary and discriminatory enforcement,'" Opening Br. 25 (quoting *Kemp*, 86 F.4th at 775), *Kemp* actually further shows that it does *not*. Indiana has shown above that the statute there explicitly targeted First Amendment-protected recording, but it also differs from the Buffer Law in another significant way. As the district court recognized, the statute challenged in *Kemp* was problematic because it prohibited interference with hunters by "barring . . . proximity to them," yet it contained "no [set] distance." Opinion, S.A. 12 n.6 (citing 86 F.4th at 752–53). While this rendered the statute susceptible to arbitrary enforcement because of the vagueness of the term "proximity," this Court explicitly distinguished that statute from those that were *not* vague (and thus not susceptible to arbitrary enforcement) because they *did* set a specific distance. 86 F.4th at 772–74. Thus, *Kemp* shows the opposite of what Mr. Nicodemus proposes: it shows that the Buffer Law, which explicitly established a 25-foot zone, is *not* susceptible to arbitrary, discriminatory enforcement.

In sum, although this Court need not reach the issue of neutrality since Mr. Nicodemus does not sufficiently challenge the district court's finding that the Buffer Law does not substantially affect First Amendment activity, the Court should find, if it does reach the issue, that the Buffer Law is neutral.

---

[16]This is also evinced by the fact that "others" were directed back at the same time Mr. Nicodemus was. Opinion, S.A. 4; *see also id.* at S.A. 5 ("others" ordered back the second time Mr. Nicodemus was ordered back). Mr. Nicodemus does not assert that these "others" were recording.

## V. The Buffer Law satisfies any level of scrutiny.

In light of the foregoing, it is plain that the Buffer Law passes any level of scrutiny. The district court did not reach the application of scrutiny, Opinion, S.A. 16 n.8, and Mr. Nicodemus does not argue that it would fail rational basis scrutiny. However, the Buffer Law would also pass intermediate and strict scrutiny.

Mr. Nicodemus claims that "cases appear not even to reach the 'narrowly tailored' analysis when an enactment is found to grant unbridled discretion . . . , instead concluding simply that the grant of unbridled discretion violates the First Amendment." Opening Br. 25 (citing *DeBoer*, 267 F.3d at 572–74; *MacDonald v. City of Chicago*, 243 F.3d 1021, 1026 (7th Cir. 2001)). However, the cases he relies upon concerned challenges to permitting policies—in *DeBoer*, a "use policy" under which citizens could apply to use a public facility for public meetings, 267 F.3d at 561; *see also id.* at 572 (analyzing use policy as providing government with "authority to grant or deny a permit" (citation omitted)), and in *MacDonald* (as the parenthetical quotation Mr. Nicodemus provides indicates) a traditional permitting ordinance for parades, 243 F.3d at 1023. Unlike the permitting discretion involved in those cases, the Buffer Law (even if viewed as affecting First Amendment activity to some degree) plainly affects only the time, place, and manner of recording. A public meeting *cannot* occur without a public meeting space. A public parade *cannot* occur without permission to use public streets or sidewalks. But, as discussed, LE activity *can* be recorded from a mere 25 feet away. This renders Mr. Nicodemus' urging of strict scrutiny misplaced. Strict scrutiny is not applied to time, place, and manner regulations.[17]

---

[17]Even under strict scrutiny, however, the Buffer Law passes muster. *Infra* Part V.C.

The proper standard of review for such regulations is intermediate scrutiny, under which a law will be upheld if it provides sufficient alternative avenues and "promotes a substantial government interest that would be achieved less effectively" in its absence. *Ward*, 491 U.S. at 798–99 (cleaned up; citation omitted). A significant degree of discretion is permitted for buffer laws that impose time, place, or manner regulations. Indeed, the Supreme Court has applied intermediate scrutiny to a buffer zone in which certain First Amendment interactions with other individuals were prohibited, *Hill v. Colorado*, 530 U.S. 703, 707 (2000), despite the broad discretion police exercised "in deciding whether to charge an offense," *id.* at 740 (Souter, J., joined by O'Connor, Ginsburg, and Breyer, JJ., concurring). This was in large part due to the fact that, if outside of the buffer zone, the speaker remained "free to speak," as opposed to the "near-absolute prohibition[] on speech" in *Schenck*. *Id.* The Buffer Law similarly permits *all* recording, from a distance that Mr. Nicodemus has not shown to significantly impact the right to record Officer activity.

**A. The Buffer Law is properly tailored.**

The Buffer Law is narrowly tailored. Indiana's foregoing discussion of the emergency incident law demonstrates why its existence does not show a failure to narrowly tailor the Buffer Law, *contra* Opening Br. 28–29. *Supra* Part III.D. Once again, in this further discussion of the emergency incident law, Mr. Nicodemus fails to cast any doubt on the district court's discussion of the great variety of situations in which LE duties will not "involve a set perimeter" of the sort the emergency incident law imposes, Opinion, S.A. 11.

While Mr. Nicodemus claims that "the statute allows persons to be moved away from police when there are no reasons to do so," this avoids the real question, which, under *Ward*'s explicit guidance, is *not* whether the law in question is "the least restrictive or least intrusive

means of" furthering the government's interests, but whether it "promotes a substantial government interest that would be achieved less effectively absent the regulation." 491 U.S. at 798–99. Mr. Nicodemus inverts this standard when he claims that narrow tailoring in this context means that the Buffer Law may only reach "'evils' . . . that actually interfere with police activities." Opening Br. 29; *see also id.* at 28 (claiming that under *Frisby v. Schultz*, 487 U.S. 474, 485 (1988), narrow tailoring requires a law to target "no more than the exact source of the 'evil' it seeks to remedy."). Indeed, the Supreme Court has explicitly rejected such a requirement: it found that although the law in *Hill* might "sometimes inhibit a demonstrator who[] would have proved harmless," it nonetheless passed constitutional muster, being "justified by the great difficulty of protecting [state interests] with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the [] boundary." 530 U.S. at 729. The Court thus overruled the strict "exact source" test that Mr. Nicodemus relies upon. *Id.* at 758–59 (Scalia and Thomas, JJ., dissenting).[18]

By finding that the Buffer Law only incidentally affected the right to record, the district court agreed with Indiana's showing that the Buffer Law presented only *de minimus* burdens on First Amendment activity, burdening no "more expressive activity than necessary to serve these interests," PI Resp., D. 25, 21. As discussed above, Mr. Nicodemus has not provided any reason to doubt this. Therefore, although Mr. Nicodemus again alludes to the incorrect legal standard

---

[18]Although *Hill* has been "eroded," it "still binds," *Price v. City of Chi.*, 915 F.3d 1107, 1111 (7th Cir. 2019), particularly in regards to buffer laws serving compelling interests. "*Hill*'s narrow-tailoring analysis . . . did not rest on the specific facts of the case or an evaluation of Colorado's evidentiary showing. Accordingly, [requiring a differing] . . . analysis would effectively deny *Hill*'s controlling force" in buffer zone cases. *Id.* at 1119.

when he claims that Indiana has not shown that the Buffer Law does "not burden more speech than is necessary," Opening Br. 29 (citation omitted), Indiana *has* shown that the law "promotes a substantial government interest that would be achieved less effectively absent the regulation" and that it does not "burden substantially more speech than is necessary to further the government's legitimate interests," *Ward*, 491 U.S. at 799.

Accordingly, the Buffer Law, if considered a time, place, or manner regulation, is properly tailored under intermediate scrutiny.

**B. The Buffer Law provides ample alternative avenues.**

The Buffer Law also leaves open myriad alternative avenues. As the district court noted, it leaves available "[e]very square inch of public space that is this short distance from a lawfully-engaged officer." Opinion, S.A. 14. Mr. Nicodemus largely rehashes earlier arguments on this front. He once more cites *Schenck* in claiming that "a distance of 15 feet places a person farther away than 'a normal conversational distance,'" claiming that the Buffer Law's 25-foot buffer "greatly restrict[s] the ability of persons to observe and record law enforcement." Opening Br. 31 (citing 519 U.S. at 377). Indiana has already discussed the inapplicability of *Schenck*, noting that the 15-foot barrier in that case was not the only reason the Court considered the law to impede conversation. Regardless, a burden on conversation is not what Mr. Nicodemus has alleged. So *Schenck* does not help Mr. Nicodemus.

While, in the same discussion, Mr. Nicodemus concedes that "many recordings of police will not involve normal conversations," he goes on to claim that such recordings "may involve a number of persons talking, vehicular traffic and other background noises, and numerous other factors that make it impossible to meaningfully observe and record either voices or video from a distance of 25-feet . . . ." Opening Br. 31. It is difficult to understand how the specified factors

could impede visual recording, and Mr. Nicodemus' general, unsuccessful attempt to cast doubt on the district court's finding that they do not has already been discussed. *Supra* Part III.C. Thus, in regards to visual recording, this point is not persuasive.

Concerning the insinuation that there is a general right to capture audio of Officer communications, two points suffice. First, as far as Officer communications not intended to be public are concerned, the district court correctly noted that these communications are generally protected by a right to privacy. Opinion, S.A. 9–10 (citing *Alvarez*, 679 F.3d at 608; *Katz v. United States*, 389 U.S. 347, 351 (1967); *John K. Maciver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2023)). Mr. Nicodemus does not address this point, thus conceding it.

Second, regarding Officer communications that are not private, the district court found that "Mr. Nicodemus's video [] belies the difficulty in capturing activity greater than 25 feet away. Throughout the video, he easily captures . . . audio of officers speaking at a greater distance [than 25 feet]." *Id.* at S.A. 14. This supports the finding that "[n]othing about this law forecloses a reporter or concerned citizen from audiovisually recording conversations that occur openly in public and at a volume audible to bystanders at 25 feet." *Id.* at S.A. 9.

Mr. Nicodemus' only retort is the conclusory allegation that various factors can "make it impossible to meaningfully observe and record either voices or video from a distance of 25-feet or more," citing his own declaration[19] claiming this *might* be a result of the Buffer Law. Opening Br. 31. As explained above, this is both a conclusory statement, not substantive argument against the district court's well-founded determinations, and a misapprehension of the proper standard, which is not whether application of the Buffer Law will *occasionally* prevent capturing audio

---

[19]Mr. Nicodemus also cites Mr. Perez' declaration. As noted above, Mr. Nicodemus has not provided any substantive reason to question the district court's determination that Mr. Perez' declaration is not relevant.

that the public has a right to capture, but whether it will substantially do so. And while Mr.

Nicodemus briefly does allude to the legal standards adduced by the district court—but not all of

them[20]—he simply states, "But citizen-journalists do have right to record and broadcast police

activity if they are not interfering with it." Opening Br. 31. Again, this simply begs the question,

which is not whether there is a right to record, but whether that right encompasses private

conversations. As the district court found, it does not. Failing to address this point, Mr.

Nicodemus thus concedes it. Accordingly, these arguments fail and the Buffer Law passes

intermediate scrutiny.

## C. The Buffer Law satisfies strict scrutiny.

Although Mr. Nicodemus urges this Court to apply strict scrutiny, he does not discuss the

application thereof. However, the Buffer Law would survive strict scrutiny if subjected to it.

Even under strict scrutiny's least-restrictive-means requirement, proposed less-restrictive

alternatives must be reasonable. *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) (citing

*Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968); *Shelton v. Tucker*,

364 U.S. 479, 488 (1960)). Virtually all LE duties serve substantial and compelling state

interests, *see* Opinion, S.A. 9–10 (Mr. Nicodemus does not deny that the Buffer Law serves these

interests or that they are substantial or compelling); it would not be reasonable to have a litany of

statutes that each relate to one particular interest. *See Hill*, 530 U.S. at 729 (pointing out, in

buffer law case, that "legal rules that focus exclusively on the individual impact of each instance

---

[20]Specifically, Mr. Nicodemus alludes to the district court's statement that "no one has the right to broadcast an entire event." *Id.* (quoting Opinion, S.A. 14). But the district court also noted amply the need for private conversations to remain private. *See* Opinion, S.A. 9–10 (citing *Alvarez*, 679 F.3d at 608; *Katz*, 389 U.S. at 351; *John K. Maciver Inst. for Pub. Pol'y*, 994 F.3d at 612; *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 978 F. Supp.2d 1, 9 (D.D.C. 2013)).

of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary" creates "great difficulty," and "[s]uch individualized characterization of each individual movement is often difficult to make accurately," so law was "justified).

Indeed, the district court recognized that the Buffer Law prevents exactly the type of distraction that would ensue if Officers were required to make such an assessment for every individual in the vicinity, "mitigating impairing law enforcement's ability to acquire information effectively or endangering their safety by distracting them from their official duties with happenings in their immediate vicinity." Opinion, S.A. 10. The Buffer Law therefore, found the court, "preserves not only the confidentiality of investigations but promotes the efficient administration of law enforcement." *Id.* (citing *United States v. Bonin*, 932 F.3d 523, 535 (7th Cir. 2019) ("protecting the integrity of government processes is compelling"); *see also Dixon v. Love*, 431 U.S. 105, 114 (1977) (noting substantial "interest in administrative efficiency"). Just as in *Hill*, such a scheme here would render enforcement impossible, which is likely why LEOs are simply "entitled to enforce [laws] free from possible interference," asking people to "move on" when necessary toward that end, *Colten*, 407 U.S. at 109; *Lund*, 956 F.3d at 947. The Buffer Law hems this right in, preventing discretion. Deference is granted to lawmakers on what distance is needed for such zones. *Burson v. Freeman*, 504 U.S. 191, 208–09 (1992).

Accordingly, the Buffer Law's *de minimus* 25-foot boundary is the least restrictive means of achieving the numerous substantial and compelling interests served by the Buffer Law. The law therefore satisfied strict scrutiny.

For all of the foregoing reasons, this Court should affirm the district court's judgement.

**VI. Additionally and Alternatively, Plaintiff Is Not Entitled to Any Relief as to the City of South Bend Because a Municipal Entity May Not Be Liable for the Enforcement of State Policy.**

Although the District Court did not reach the issue of *Monell* liability, this Court can affirm the judgment based on any ground supported in the record, as long as it was adequately addressed in the District Court and Mr. Nicodemus had an opportunity to contest it. *EEOC v. Wal-Mart Stores East, L.P.*, 46 F.4th 587, 593 (7th Cir. 2022). The issue of municipal liability was briefed by the parties and argued during the consolidated hearing. It is therefore appropriate to affirm the judgment in favor of South Bend on the additional and alternative ground that Mr. Nicodemus did not present any evidence from which the District Court could have found that a South Bend policy was the moving force behind a deprivation of Mr. Nicodemus' constitutional rights (if he had in fact suffered a deprivation of his constitutional rights).

In *Monell v. New York City Department of Social Services*, the Supreme Court held that a municipal entity may not be liable under Section 1983 unless a policy or custom caused the plaintiff's injury. 436 U.S. 658, 690–95 (1978). The *Monell* policy-or-custom requirement applies equally to claims for damages and to claims for declaratory or injunctive relief. *Los Angeles County v. Humphries*, 532 U.S. 29, 36–39 (2010).

The policy at issue in this action is not a policy of the City of South Bend. Rather, the policy at issue in this action is a policy of the State of Indiana. Compl., D. 1, 10, 39. A municipal entity may not be liable for the enforcement of state policy. *See Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 790–91 (7th Cir. 1991). In *Surplus Store*, the municipality was sued because its officer used authority conferred by a state statute to seize stolen property and return it to its rightful owner without a hearing to determine ownership. *Id.* at 789–91. The plaintiff argued that the municipal defendant had a policy of allowing or instructing its police

officers to enforce the state statutes. *Id.* at 791–92. This Court rejected that argument, holding that the "'policy' of enforcing state law . . . cannot be sufficient to ground liability against a municipality." *Id.* This Court reached similar conclusions in *Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004) (mayor's actions in implementing state liquor control laws insufficient for *Monell* liability), and *Ross v. Town of Austin*, 343 F.3d 915, 918 (7th Cir. 2003) (in Indiana, policies on police officer training are set by state statute).

In the district court, Mr. Nicodemus argued that this Court in *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716, 718–19 (7th Cir. 1998), and *Snyder v. King*, 745 F.3d 242, 246–48 (7th Cir. 2014), established a different rule, that a municipality is liable for its employees' actions if those actions were merely *authorized* (as opposed to *compelled*) by state statute. D. 25 at 23–24. The opinions cited by Mr. Nicodemus did not establish any such rule. Both opinions involved only actions that were compelled by state statute, not actions that were authorized by state statute. *Snyder*, 745 F.3d at 248; *Bethesda Lutheran*, 54 F.3d at 718. This Court had no occasion in those appeals to say what the result would be if the employee had acted pursuant to a state statute that authorized (as opposed to compelled) the employee's actions, so anything contained in those opinions about what the result would be in the case of an authorized action is dicta *See U.S. v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988).

The rule in such cases is instead expressed in *Surplus Store*—an action that is authorized by state statute involves state policy, not municipal policy. This result makes sense. After all, state statutes authorize law enforcement officers to make arrests and to use force, but no one would suggest that a municipal entity should be subjected to liability because its officer used the authority granted by those statutes to make an arrest or to use force. That would clearly be

"backsliding into *respondeat superior* liability." *1st Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021).

Finally, South Bend's formal policy on public recording of law enforcement activity is set out in the record. D. 25-7. Mr. Nicodemus does not contend that South Bend's policy violates the First Amendment.

For these additional and alternative reasons, the Court should affirm the judgment as to the City of South Bend.

## Conclusion

Mr. Nicodemus has failed to cast any doubt on the district court's determination that the Buffer Law does not have a meaningful effect on First Amendment activity. Further, he has not shown that, even if that determination was wrong, the Buffer Law affords unbridled discretion or any other reason to subject the Buffer Law to First Amendment scrutiny. Nor has he demonstrated that the City of South Bend is subject to municipal liability. For all of these reasons, as explained above, this Court should affirm the district court's judgment.

May 10, 2024

Respectfully submitted,

Joseph W. Smith, Ind. Bar No. 29663-64
Clark Johnson & Knight, Ltd.
233 East 84th Drive, Suite 301
Merrillville, IN 46410
JSmith@cjklaw.com
Phone: 219/322-0830
Fax: 219/322-0834


Matthew S. Clark, Ind. Bar No. 33712-45
Clark Johnson & Knight, Ltd.
5600 North River Road, Suite 600
Rosemont, Illinois 60018
mclark@cjklaw.com
Phone: 847/261-0700
Fax: 847/261-0714

*Attorneys for City of South Bend*

Theodore E. Rokita
Indiana Attorney General
Attorney No. 18857-49

By:
/s/James Bopp, Jr.
James Bopp, Jr., Ind. Bar No. 2838-84
Joseph D. Maughon, Va. Bar No. 87799
Taylor C. Shetina, Ind. Bar. No. 37887-45
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, IN 47807
Telephone: 812/232 2434
Facsimile: 812/235-3685
jboppjr@aol.com
jmaughon@bopplaw.com
tshetina@bopplaw.com

*Attorneys for Indiana*

## Certificate of Compliance with Type-Volume Limit

This document complies with the word limit of Cir. R. 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,969 words based on the "Word Count" feature of WordPerfect 2021.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), and Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface using WordPerfect 2021 in Times New Roman 12-point font.

May 10, 2024

/s/Joseph D. Maughon_____
Joseph D. Maughon