IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
No. 24-1099

———————————————————————

DONALD NICODEMUS

Plaintiff-Appellant,

v.

CITY OF SOUTH BEND, INDIANA

Defendant-Appellee

and

STATE OF INDIANA,

Intervenor/Defendant-Appellee

———————————————————————

On Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division
No. 3:23-cv-00744-DRL-MGG
The Honorable Damon R. Leichty, Judge

## REPLY BRIEF OF APPELLANT

———————————————————

Kenneth J. Falk
*Counsel of Record*
Gavin M. Rose
Stevie J. Pactor
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
kfalk@aclu-in.org

Attorneys for Appellant

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Summary of the Argument ....................................................................................... 1

Argument ................................................................................................................ 3

    I.    Indiana Code §35-44.1-2-14 directly burdens activity protected by the First Amendment and is unconstitutional as it is standardless and grants unbridled discretion to law enforcement to restrict this activity .......................................................................................... 3

        A.    The statute directly burdens activity protected by the First Amendment ....................................................................... 3

        B.    The statute is not content neutral as it vests unbridled discretion in law enforcement officers ................................... 8

        C.    The statute fails strict scrutiny ............................................ 13

    II.    The statute fails the intermediate scrutiny that must be met if an enactment has an incidental burden on expressive conduct .......... 14

        A.    The statute fails the narrow tailoring requirement ............. 15

        B.    The statute fails to leave open ample alternative channels of communication ...................................................................... 17

    III.    South Bend may be held liable under *Monell* ................................. 18

Conclusion ............................................................................................................. 21

Certificate of Compliance ..................................................................................... 22

# TABLE OF AUTHORITIES

**Cases:**

*ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ................................ *passim*

*Ameren Services Co. v. Fed. En. Reg. Comm'n*, 880 F.3d 571 (D.C. Cir. 2018) ........... 4

*Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102 (D. Ariz. 2022) ....... 18

*Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998) .....
.................................................................................................................... 19-21

*Brice v. Va. Beach Corr. Center*, 58 F.3d 101 (4th Cir. 1995) ..................................... 5

*Brotherton v. Cleveland*, 173 F.3d 552 (6th Cir. 1999) ............................................ 20

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023) ..................................................... 1, 3, 6

*City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987) ......................................... 7, 11, 14

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ....................... 9, 13

*Dist. of Columbia v. Merit Sys. Protection Bd.*, 762 F.2d 129 (D.C. Cir. 1985) ..... 3, 19

*Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d (7th Cir. 2013) ..................... 16

*Frisby v. Schultz*, 487 U.S. 474 (1988) ............................................................ 2, 15, 16

*Geft Outdoor, LLC v. Monroe Co., Ind.*, 62 F.4th 321 (7th Cir. 2023), *cert. denied*,
__U.S.__, 144 S. Ct. 96 ........................................................................................ 10

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) ............................................................ 17

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2007) ............................................. 3, 18

*Hague v. CIO*, 307 U.S. 496 (1939) ............................................................................. 8

*Hill v. Colorado*, 530 U.S. 703 (2000) ................................................................. 15, 16

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .................................. 1, 6, 7

*In re Brand Name Prescription Drugs Antitrust Litigation,* 115 F.3d 456 (7th Cir.
1997) .................................................................................................................... 18

*McDonald v. City of Chicago*, 243 F.3d 1021 (7th Cir. 2001).................................... 13

*Minnesota Voters Alliance v. Mansky*, 585 US. 1 (2018) ............................................. 9

*Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 (1978) ................................................................................................................... *passim*

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).................................................... 20

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .......................................................... 14

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ....................................................... 2, 13

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) .......................... 18

*Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357 (1997) ........... 5, 15, 17

*Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282 (7th Cir. 2014) ................................................................................................................... 1, 9, 13

*Snyder v. King,* 745 F.3d 242 (7th Cir. 2014) ........................................... 3, 19, 20, 21

*Surplus Store & Exchange, Inc. v. City of Delphi,* 928 F.2d 788 (7th Cir. 1991) ...... 19

*United States v. O'Brien*, 391 U.S. 367 (1968) .......................................................... 15

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) 12

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...................................... 1, 2, 8, 15

*Water Quality Ass'n Employees' Benefit Corp. v. United States*, 795 F.2d 1303 (7th Cir. 1986) ..................................................................................................... 10, 13

**Statutes:**

<u>United States Code</u>:

42 U.S.C. § 1983......................................................................................................... 19

<u>Indiana Code:</u>

Indiana Code § 35-44.1-2-14 ............................................................... *passim*

Indiana Code § 35-44.1-3-1(a) .................................................................14, 16

Indiana Code § 35-44.1-4-1.5...............................................................14, 16

Indiana Code § 35-44.1-4-2..................................................................14, 16

Indiana Code 35-44.1-4-5 .....................................................................14, 16

# SUMMARY OF THE ARGUMENT

1.     The First Amendment protects a person's right to view, approach, listen to, and record law enforcement, provided that there is no interference with police activity. *Brown v. Kemp*, 86 F.4th 745, 779 (7th Cir. 2023); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). Indiana Code § 35-44.1-2-14 directly impacts this right as it allows officers to push persons who wish to see, hear, and record police activity back 25 feet or farther from the activity for any reason, violating their First Amendment rights. A law that "*generally* functions as a regulation of conduct" is subject to the most rigorous scrutiny under the First Amendment if the "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27, 28 (2010) (emphasis in original). Indiana Code § 35-44.1-2-14 is such a law in that communicative conduct, as is Mr. Nicodemus's, can trigger application of the statute.

Inasmuch as the statute imposes a direct burden on First Amendment rights, it must, among other things, be content neutral. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The requirement of content neutrality is violated if a statute that negatively impacts First Amendment rights contains no standards, granting unbridled discretion to those enforcing it. *Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014). It is clear from the face of the statute that it contains no standards to limit the discretion of police in deciding when to use it and against whom. This lack of standards in a state statute cannot be remedied or supplemented by a policy statement of the South Bend Police

Department, one of hundreds local government units in Indiana, that predates the statute and that was not relied on in any way during the statute's enforcement against Mr. Nicodemus.

As the statute contains no standards, it is not content neutral and must satisfy strict scrutiny, *i.e.*, it must be narrowly tailored to serve a compelling governmental interest. *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015). The statute is not tailored at all. Instead it allows First Amendment rights to be quashed for no reason, or for reasons that change from officer to officer and from observer to observer. The statute fails strict scrutiny.

2.     Even if strict scrutiny does not apply, the statute must satisfy intermediate scrutiny as it has at least an incidental burden on First Amendment expression. Under intermediate scrutiny the statute must be "narrowly tailored to serve a significant governmental interest" and it must "leave open ample alternative channels of communication." *Ward*, 491 U.S. at 791 (internal quotation and citations omitted). Although the appellees ("State") do not dispute that intermediate scrutiny should be applied, they erroneously argue that the statute satisfies this scrutiny. It does not.

While it is certainly reasonable for a statute to prohibit conduct that actually interferes with police activity, the challenged statute obviously extends further than this, impacting much more than the "evil" that Indiana can legitimately remedy. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). It is not narrowly tailored. And given that the statute can prevent persons from effectively seeing, hearing, and recording police

activity, it fails to leave open ample alternative channels to reach the intended audience of these persons. *See Gresham v. Peterson*, 225 F.3d 899, 906-07 (7th Cir. 2007).

3.    *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 (1978), does not preclude South Bend from being held liable for the First Amendment violation here. This is largely a theoretical issue since the State of Indiana, having intervened, may have relief ordered against it even if South Bend is dismissed as a party. *Dist. of Columbia v. Merit Sys. Protection Bd.*, 762 F.2d 129, 132 (D.C. Cir. 1985). However, South Bend is properly a party as it is not compelled by state law to enforce Indiana Code § 35-44.1-2-14, but has willingly chosen to do so. *See, e.g.*, *Snyder v. King,* 745 F.3d 242, 248 (7th Cir. 2014). South Bend is therefore liable under *Monell.*

## ARGUMENT

I.    Indiana Code § 35-44.1-2-14 directly burdens activity protected by the First Amendment and is unconstitutional as it is standardless and grants unbridled discretion to law enforcement to restrict this activity

A.    The statute directly burdens activity protected by the First Amendment

The State does not disagree that the First Amendment protects the right of persons to record law enforcement activity when the recording does not interfere with police activities. This was established by this Court's decision in *Alvarez.* 679 F.3d at 595. Nor does the State dispute that this right necessarily allows persons to approach officers as approaching is part of the protected "act of *making* an audio or audiovisual recording [that] is necessarily included with the First Amendment's guarantee." *Id.*

(emphasis in original)*, see also Kemp*, 86 F.4th at 779 (noting that the prohibition on "approaching" hunters to photograph them violated the First Amendment as approaching the hunters was essential to carry out the constitutionally protected recording). Nevertheless, the State argues that the statute does not directly burden rights protected by the First Amendment. The State is incorrect.

As an initial matter, the State seeks to avoid the necessary application of the above cases, and the numerous other cases setting forth identical principles (*see* Appellant's Br. at 13-14), by arguing that "Mr. Nicodemus does not substantially challenge the district court's determination that the Buffer Law does not affect the right to record." (State's Br. at 18). Of course Mr. Nicodemus is challenging any such determination. The State relies for its argument on the district court's statement, not based on any evidence presented in the case, that given zoom lenses and parabolic microphones, as well as "ever-increasing capabilities of cellphones . . . it seems rather strained to argue" that the statute substantially burdens citizens' ability to record the police. (Opinion ["Op."], Short Appendix ["S.A."] at 13). This statement is in the district court's conclusions of law and the district court made no similar finding of fact. (*See* Op., S.A. at 3-5, 13). This is not a factual finding.[1] *See, e.g., Ameren Services Co. v. Fed. En. Reg. Comm'n*, 880 F.3d 571, 580 (D.C. Cir. 2018) ("FERC's musing

---

[1]    This is in contrast to the factual finding made by the district court, for example, that after being moved back an initial distance of 25 feet by one officer, and before being moved even further back by another officer, a car had driven down Brookfield Street, through the area into which Mr. Nicodemus had been denied entry. (Op., S.A. at 5).

that network upgrades might actually reduce reliability is hardly a 'finding of fact' to which we are obligated to defer."); *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 106 (4th Cir. 1995) (concluding that the magistrate judge's self-styled "musings" and "observations" did not present findings that could be reviewed).

Indeed, contrary to the State's argument, the district court recognized that from 25 feet or more away "[p]erhaps Mr. Nicodemus didn't pick up quieter conversations between officers." (Op., S.A. at 14). This is certainly not a unique observation, as the Supreme Court has recognized that having to stay more than 15 feet away puts a person beyond "a normal conversational distance." *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 364, 377 (1997).[2] And, regardless of the events of July 20, 2023, when the challenged statute was enforced against Mr. Nicodemus, he attested to the fact that "[d]epending on the circumstances, it is often difficult or impossible to hear and see what is happening, and to ensure that my recording devices capture the specifics or what is happening, from more than 25 feet away." (Dkt. 20-1 at 2 ¶ 11).[3] The challenged statute affects Mr. Nicodemus's right to

---

[2]    The State argues that this statement by the Supreme Court was "not an abstract conclusion, but one closely tied to the facts." (State's Br. at 23). It is not clear what this means, as it appears that the Court was making a statement based on human experience. Moreover, in many circumstances, a citizen-journalist, pushed back at least 25 feet, will have to deal with traffic and other noises in trying to see, hear, and record events—and may have their line-of-sight obstructed by a wide variety of additional objects—and therefore will be attempting to perceive and record in settings more challenging than recording a normal conversation.

[3]    Mr. Nicodemus presented the declaration of another citizen-journalist, Robert Perez, who also was pushed back more than 25 feet from caution tape that police had put up around an event that he was attempting to record and who stated that "[h]aving to be 25 feet away from police activity may make it difficult if not impossible to record the public police investigation in such a way that my viewers can fully understand what is taking place." (Declaration of Perez, Dkt. 31-1 at 2-3 ¶¶ 10-15,19). The district court dismissed Mr. Perez's

effectively observe and record police activity.

What the State is left to argue is that the statute regulates conduct and only incidentally impacts expression. As Mr. Nicodemus noted in his brief (Appellant's Br. at 26-32) and reiterates below (Section II), even incidental burdens on expressive conduct must satisfy intermediate scrutiny, a standard that the statute does not meet. But the statute does not indirectly or incidentally burden expressive conduct. Instead, it allows law enforcement to establish boundaries that make it difficult if not impossible to approach to see, hear, and record, all of which is admittedly protected by the First Amendment. *Kemp*, 86 F.4th at 771.

In *Holder*, the Court recognized that even if a law "*generally* functions as a regulation of conduct," it is nevertheless subject to the strictest scrutiny under the First Amendment if the "conduct triggering coverage under the statute consists of communicating a message." 561 U.S. at 27, 28 (emphasis in original). The burden on persons to approach, see, hear, and record law enforcement is not an incidental or indirect result of the challenged statute, but is the direct result of its purpose—to allow persons to be kept away from law enforcement in public places.

The State argues that *Holder* is inapposite because the plaintiffs there presented an as-applied challenge to the statute. (State Br. at 19-20). The relevance of that is not clear as the point is that *Holder* recognizes, in the context of a statute

---

statement by noting that he "has no standing here." (Op., S.A. at 14 n.7). Of course, Mr. Perez was not attempting to participate in this case as a party and the standing comment is therefore misplaced. In any event, this Court can take notice of the fact that citizens have been able to see, hear, and report on newsworthy events that might have been lost if they were forced to move back 25 feet or successive 25-foot distances by different officers. (Appellant's Br. at 19 & n.2).

prohibiting the provision of material support or resources to terrorist organizations, that a statute regulating conduct is nevertheless subject to First Amendment scrutiny if it is applied to conduct designed to communicate a message, thus subjecting it to strict scrutiny.[4] 561 U.S. at 28. As this Court noted in *Alvarez,* "[w]hen the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play." *Alvarez,* 679 F.3d at 602.

The State also mistakenly rejects the significance of *City of Houston, Texas v. Hill*, 482 U.S. 451 (1987), where the Court examined the constitutionality of an ordinance that made it unlawful to "oppose . . . abuse, or interrupt any policeman in the execution of his duty." *Id.* at 455. Although the Court read out of the ordinance a prohibition on assaulting or striking an officer as those provisions were preempted by state law, *id.* at 461, the remainder of the ordinance prohibited verbal interruptions of police officers by those engaging in expressive activity. The Court recognized that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-63 (footnote omitted). The ordinance was deemed to violate the First Amendment as the First Amendment requires that government tolerate "a certain amount of expressive disorder." *Id.* at 472. Of course, Indiana Code § 35-44.1-2-14 allows expressive conduct to be

---

[4]     The State also seeks to diminish the import of *Holder* by pointing out that the statute survived the required strict scrutiny. The fact that the statute in *Holder*, designed to protect against foreign terrorist organizations, is one of the few examples of a legislative enactment that withstands the highest constitutional scrutiny, 561 U.S. at 28-29, 39, should be of no solace to the State where the statute challenged here comes nowhere close to satisfying strict scrutiny. (*See infra* at Section I(C); Appellant's Br. at 25-26).

prohibited even in the absence of any "disorder" or any verbal interruptions whatsoever, as it allows officers to prohibit expressive conduct that is merely observing and recording.

As Mr. Nicodemus noted previously, in the 21st century there is not a small discrete subset of journalists plying their trade, leaving the rest of us unaffected by the challenged statute. We are all potential reporters, able to observe, record, publish, and stream when matters develop in front of us. The challenged statute most certainly has more than an indirect impact on First Amendment expression.

B.   The statute is not content neutral as it vests unbridled discretion in law enforcement officers

The challenged statute directly burdens the ability of Mr. Nicodemus and others to exercise their First Amendment rights on streets, sidewalks, and parks, places that have "immemorially" been reserved for expressive conduct. *Hague v. CIO*, 307 U.S. 496, 515 (1939). The statute therefore must be content neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). The statute is not content neutral because it is standardless, vesting absolute discretion in law enforcement as to whether to create 25 foot buffer zones or repetitive 25 foot zones, and against whom to do so.  This point should not require legal citation, for the statute was employed to require that Mr. Nicodemus retreat beyond an artificial perimeter even though vehicular traffic was allowed to travel

between the investigation taking place and this "perimeter." (Op., S.A. at 5).[5]

Nonetheless, the State's initial response to Mr. Nicodemus's argument is to assert, as the district court held, that the statute is not substantially overbroad. (State Br. at 13-17). As Mr. Nicodemus has argued repeatedly, he is not making an overbreadth challenge. (Appellant's Br. at 8, 15 n.1), and the State gets nowhere by arguing against a claim that Mr. Nicodemus has not made.[6]

This Court has made it clear that "[t]o qualify as 'content neutral' a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." *Smith v. Exec. Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) (further citations omitted). The Supreme Court has "long held" that such a scheme is subject to a facial challenge as the "unfettered discretion" can lead to self-censorship. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755, 757 (1988). The lack of objective standards to guide a decisionmaker's regulation of First Amendment expression will doom the constitutionality of any attempted regulation, whether in the context of licensing or other settings. *See, e.g., Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 21 (2018).

The State seeks to ignore this jurisprudence by arguing that these cases all

---

[5]     In response to Mr. Nicodemus pointing this out in his brief, the State argues that Mr. Nicodemus has omitted and ignored "essential findings of fact" and claims that only a truck was allowed to pull through the intersection. (State's Br. at 32). However, subsequent to this cars were allowed to drive down Brookfield Street, even though this was within the zone marked off by one of the officers. (Nicodemus, Dkt. 20-1 at 4 ¶ 30; Op., S.A. at 3, 5).

[6]     This is not to say that the statute might not be susceptible to such a challenge. (*See* Brief of Amicus Curiae The National Press Photographers Association, et al. at 7-19).

concerned laws that were "plainly, on their face, directed against speech." (State Br. at 16). But this is nothing more than a continuation of the State's argument that the challenged statute does not directly burden expressive conduct protected by the First Amendment. It certainly does and, therefore, Indiana Code § 35-44.1-2-14 must be judged by the standards to which enactments directly impacting First Amendment interests must be measured. This includes the requirement that the statute "not put too much discretion in the hands of government officials." *Geft Outdoor, LLC v. Monroe Co., Ind.*, 62 F.4th 321, 327 (7th Cir.), *cert. denied*, __U.S.__, 144 S. Ct. 96 (2023).

So what are the standards provided by the challenged statute? The district court concluded that the statute criminalizes the "knowing encroachment into a zone of integrity that facilitates the performance of an officer's duties." (Op., S.A. at 8). Of course, the statute contains no such language. The State cannot defeat an argument that the statute contains no standards by arguing for a standard that is not in the statute. Nor is it appropriate for a court to rewrite a statute, including by adding words to the statute's language. *See, e.g., Water Quality Ass'n Employees' Benefit Corp. v. United States*, 795 F.2d 1303, 1309 (7th Cir. 1986).

Moreover, what is a "zone of integrity" and how does that limit an officer's ability to deny the First Amendment rights of persons who wish to observe and record police activities? After all, as noted, the district court found that while Mr. Nicodemus was being pushed back by successive perimeters being erected by two different officers, the "zone of integrity" was open to a car driving down "Brookfield

Street—straight through this location." (Op., S.A. at 5). Whatever "zone of integrity" means, it certainly is not an objective standard.

The officer who arrested the person berating him in *Hill* concluded that he was being interrupted in his official capacity as a police officer, *i.e.*, his "zone of integrity" had been violated. 482 U.S. at 454. This was certainly not enough to save the ordinance from a finding that it was constitutionally infirm. In *Alvarez*, the officials who defended the use of the Illinois eavesdropping statute to prohibit persons recording them while performing their official duties in public argued that the statute facilitated the performance of an officer's duties for a host of reasons. 679 F.3d at 607. Again, this did not save the statute.

Moving on, the State argues that the fact that the statute requires that an officer be "lawfully engaged in the execution" of their duties is a standard that limits discretion. (State's Br. at 29). But all this means is that the officer must be on duty. It is not a limiting standard for those officers who are on duty. Again, the officer in *Hill* who was being yelled at was "lawfully engaged" in his duties. For that matter, the officers who arrested George Floyd were engaged in their duties, as is the officer walking down the street who just doesn't want to be recorded. This is no standard at all, and the district court's contrary conclusion was erroneous.

The requirement of a warning prior to arrest, likewise, provides no standard. (*See* State's Br. at 30). Warning someone before they are arrested for exercising their First Amendment rights is not a standard constraining the officers in any way. By that time, the First Amendment violation has occurred.

The State argues that the failure of the statute to contain any standards is cured because there is a policy statement of the South Bend Police Department concerning recording of law enforcement activity, dated prior to the enactment of the challenged statute, which it insists restricts the unlimited discretion otherwise bestowed by the law. (State's Br. at 30-31, citing to Dkt. 25-7 at 1 [noting copyright of March 24, 2023]). This is a curious argument. It concedes the fact that the statute has no standards and argues that the many hundreds of cities, towns, and villages in Indiana can supply their own standards. This would necessarily mean that the terms of the statute would vary in each political subdivision, which hardly solves the constitutional problems with the statute. The State cites no authority for the proposition that a statute with no standards becomes less standardless because of the operation of ever-shifting local regulations. This cannot be and, not surprisingly, the district court did not rely upon the South Bend policy.

Moreover, the policy statement is not a binding pronouncement, and Mr. Nicodemus was informed by a South Bend officer that the challenged law, not any policy statement, allowed the officer to push Mr. Nicodemus back. (Op., S.A. at 4; Nicodemus, Dkt. 20-1 at 5 ¶ 33). And while it is true that a court may consider a limiting construction given by enforcement agencies in construing enactments that have been challenged as unconstitutionally vague, *see, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982), there is nothing vague about the challenged law. It allows the police to erect a 25-foot barrier without any standards whatsoever. Law enforcement may rely on this law, and have

relied on this law. The State is again arguing that this Court should rewrite the statute, which this Court cannot do. *Water Quality Ass'n,* 795 F.2d at 1309.

Ultimately, the State appears to argue that it should be presumed that law enforcement will enforce the law in an appropriate and constitutional matter. But, as the Supreme Court has held, it simply cannot be presumed that government actors "will act in good faith and adhere to standards absent from the [statute]'s face [as] this is the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood*, 486 U.S. at 770.

C.      The statute fails strict scrutiny

The statute grants law enforcement unfettered discretion to suppress expressive conduct. The statute is therefore not content neutral. *Smith*, 742 F.3d at 289. A content-based restriction on expressive activities must satisfy strict scrutiny, requiring that the restriction be narrowly tailored to serve a compelling governmental interest. *Reed v. Town of Gilbert,* 576 U.S. 15, 163 (2015). Of course, given that a statute without standards can always be tailored by providing standards, "[i]t is well established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech." *McDonald v. City of Chicago*, 243 F.3d 1021, 1026 (7th Cir. 2001) (citation omitted).

Nevertheless, the State argues that the statute satisfies strict scrutiny because it "serves substantial and compelling state interests" and the 25-foot barrier "is the least restrictive means of achieving" these interests. (State Br. at 39-40). Of course,

"municipalities [are not] powerless to punish physical obstruction of a police action," but the conduct can only "be punished under a properly tailored statute, such as a disorderly conduct statute that makes it unlawful to fail to disperse in response to a valid police order or to create a traffic hazard." *Hill*, 482 U.S. at 463 n.11. Indiana has such a statute, Indiana Code § 35-44.1-3-1(a), creating an offense for obstructing or interfering with law enforcement personnel while the officer is lawfully engaged in their duties. Indiana also has a statute that allows police to establish a 25-foot "emergency incident area" when there is an actual emergency incident. Ind. Code §§ 35-44.1-4-1.5, 2, 5. If the State believes that other statutes are necessary to prevent actual interference with police activities, it may pass statutes that have standards, presumably directed toward that interference, to cabin police discretion. Indiana Code § 35-44.1-2-14 is most certainly not such a tailored statute. No state interest is served by a statute allowing First Amendment rights to be compromised based solely on the unfettered discretion of the government actor, without requiring any cause whatsoever. Again, this is not a case about a tailored statute that requires a person to stay a certain distance away when there is obstruction of or interference with police action. The availability of such easy "alternatives thus undercuts significantly any defense of such a statute." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (quotation and citation omitted). The statute certainly does not satisfy strict scrutiny, and it is unconstitutional.

II.  The statute fails the intermediate scrutiny that must be met if an enactment has an incidental burden on expressive conduct

Even if the statute is not deemed to directly burden expression protected by

the First Amendment, it certainly has an incidental burden on expressive activities. It therefore must satisfy intermediate scrutiny, which requires that the statute be "narrowly tailored to serve a significant governmental interest" and that it "leave open ample alternative channels of communication." *Ward*, 491 U.S. at 791 (internal quotation and citations omitted); *see also United States v. O'Brien*, 391 U.S. 367, 377 (1968). The State appears to agree that at least intermediate scrutiny applies here, but argues that the challenged statute is appropriately tailored and that it leaves open adequate alternative channels of communication. (State Br. at 35-39).[7] The State errs.

A.     The statute fails the narrow tailoring requirement

The State disagrees as to the burden imposed upon it by the requirement of narrow tailoring. It argues that the Supreme Court's statement in *Frisby v. Schultz*, 487 U.S. 474 (1988), an intermediate-scrutiny case, that "[a] statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks

---

[7]     The State cites to *Hill v. Colorado*, 530 U.S. 703 (2000), as support for its argument that only intermediate scrutiny should apply here. (State Br. at 35). Of course, the statute in *Hill*, which prohibited approaching within 8 feet of another person within 100 feet of a health facility's entrance to pass out a leaflet, to display a sign, or to engage in oral protest, education, or counseling with the person, 530 U.S. at 707, did not suffer from the lack of standards that afflicts Indiana Code § 35-44.1-2-14. If a "buffer-zone" statute is not content neutral, it is subject to strict scrutiny. *See, e.g.*, *Aubin v. Bonta*, 665 F. Supp. 3d 1097, 1100, 1104 (N.D. Cal. 2023) (addressing a statute that prohibited approaching within 30 feet of a person when they were entering a vaccination site "for the purpose of obstructing, injuring, harassing, intimidating, or interfering" with the person.) (statutory citation omitted).

However, the State's citation to *Hill* is interesting as the Court in that case recognized that the "8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" *Hill*, 530 U.S. at 726-27 (quoting *Schenck*, 519 U.S. at 377). The 25-foot barriers allowed by the challenged statute are far from normal conversational distance and form obstacles to being able to hear and record, as well as possibly seeing the activity.

to remedy," *id.* at 485 (citation omitted), is no longer good law. (State Br. at 36). This Court has cited *Hill v. Colorado* as an example where some over-inclusiveness in a statutory prohibition "was 'justified by the great difficulty' in creating a law that 'targets and eliminates no more than the exact source of the 'evil.'" *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694, 700 (7th Cir. 2013) (some internal quotations omitted) (quoting *Hill,* 530 U.S. at 729; *Frisby*, 487 U.S. at 485). The requirement under intermediate scrutiny that the source of the evil be targeted with precision remains good law absent this "great difficulty."

Here there is no difficulty in creating a law that "targets and eliminates" the "evil" that the State can legitimately address—actual interference with police activities, whether the person interfering is 2 feet or 50 feet away. As noted, Indiana already has statutes that allow law enforcement to protect themselves from actual interference through the laws that prohibit the forcible interference or obstruction of an officer and prevent the entrance into emergency incident areas created by officers. *See* Ind. Code § 35-44.1-4-1.5, 2, 5; Ind. Code § 35-44.1-3-1(a). If there is a perceived gap in those statutes, that gap can be filled by a narrowly tailored statute that addresses actual interference with police activities. The gap cannot be filled by Indiana Code § 35-44.1-2-14, which allows a 25-foot barrier, and perhaps successive 25-foot barriers, to be erected by law enforcement for no reason whatsoever and to potentially be deemed by law enforcement to be applicable to some persons, but not to others. Unlike the defendants in *Hill,* the State here simply has not carried its burden to demonstrate that a more tailored statute is not possible. It certainly is. The

statute therefore fails intermediate scrutiny and is unconstitutional.

> B.   The statute fails to leave open ample alternative channels of communication

In order to see, hear, and record law enforcement "performing their official duties in public," *Alvarez*, 679 F.3d at 597, persons must be able to travel close enough to see, hear, and record. It is as simple as that. And while the district court opined that Mr. Nicodemus was able to capture some activity from more than 25 feet away in his July 20, 2023 video, while acknowledging that perhaps he did not pick up all the conversations (Op., S.A. at 14), there is no way of knowing what more Mr. Nicodemus would have seen, heard, and captured if he could have travelled closer. It is certainly possible that someone standing 25 feet away from George Floyd being pinned to the ground by Derek Chauvin might have been able to observe what was happening, depending on where the perimeter was established. But would they have been able to see it as clearly as they could when they were but a few feet away? (*See* Appellant's Br. at 19 n.2). And, of course, the further away they were pushed, the greater the possibility that their line-of-sight would be obstructed. Would they have been able to hear his last words if they were far past the point that the Supreme Court has recognized is beyond a "normal conversational distance"? *Schenck*, 519 U.S. 364, 377 (1997).

The State acts as if wanting to get closer than 25 feet so that one can see, hear, and record police activity is something untoward and unusual. As Mr. Nicodemus noted in his opening brief, in *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011), qualified immunity was denied to officers who had arrested the plaintiff who was filming them

from about 10 feet away. *Id.* at 80. In *Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102 (D. Ariz. 2022), the statute that was preliminarily enjoined criminalized recording of a law enforcement officer from closer than 8 feet after being directed to move back by the officer. *Id.* at 1105.

It is cardinal that "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988). So, if Mr. Nicodemus or any other person wishes to travel closer than 25 feet so they can meaningfully see, hear, and record, but they are precluded from doing so by the statute, what alternative channels of communication do they have? Operation of the statute forecloses their ability to reach their audience and violates the requirement that there be ample alternative channels of communication. *Gresham v. Peterson*, 225 F.3d 899, 906-07 (7th Cir. 2007) (noting that the speaker's ability to reach one audience cannot be totally foreclosed).

III. South Bend may be held liable under *Monell*

As a final argument, the State contends that South Bend cannot be held liable under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 (1978), because it is enforcing a state law. As noted below, this argument is incorrect. However, it is also not particularly relevant as the *Monell* argument does not apply to the State of Indiana, which has intervened into this case. "[A]n intervenor. . . is a party." *In re Brand Name Prescription Drugs Antitrust Litigation,* 115 F.3d 456, 457 (7th Cir. 1997). The State of Indiana having intervened, Mr. Nicodemus may "obtain

relief against the [State] even if the original defendant is eliminated from the lawsuit." *Dist. of Columbia v. Merit Sys. Protection Bd.*, 762 F.2d 129, 132 (D.C. Cir. 1985).

However, *Monell* does not protect South Bend from liability for its discretionary decision to enforce the challenged statute. The State cites to *Surplus Store & Exchange, Inc. v. City of Delphi,* 928 F.2d 788 (7th Cir. 1991), one of a number of cases where this Court has stressed that when a municipality is compelled to act by a state law, it cannot be held liable for taking the action required by the law. Thus, in *Surplus Store* no municipal liability was found when a state statute did not require a pre-deprivation hearing when allegedly stolen property was returned to its true owner by a police officer without a hearing as the officer was merely complying with the law. *Id.* at 790-91. In *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998), this Court cited *Surplus Store* for the proposition that while a local governmental entity "does not have the shield of the Eleventh Amendment, it cannot be held liable under section 1983 for acts that it did under the command of state or federal law." *Id.* at 718. Similarly, in *Snyder v. King*, 745 F.3d 242 (7th Cir. 2014), this Court concluded that county election officials were not subject to liability through 42 U.S.C. § 1983 for actions that they took that were compelled by state law as they were not "independently responsible for the allegedly unconstitutional act." *Id.* at 247. In all these cases the local-government entities were "acting under compulsion of state or federal law." *Bethesda Lutheran*, 154 F.3d at 718. If the local government is compelled to act it cannot be held liable as *Monell* only subjects to

liability a government actor who has made a "deliberate choice to follow a course of action . . . from among various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

The problem for the State is that this line of cases does not prevent municipal liability when the municipal defendant has discretion under state law to act or refrain from acting. This is clear from *Bethesda Lutheran* itself, which recognized the distinction articulated in *Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993), "between the state's command (which insulates the local government from liability) and the state's authorization (which does not)." 154 F.3d at 718. *Snyder* highlighted the same distinction, suggesting that a municipality may be held liable when it takes action that is "merely authorized, not compelled, by state law." 745 F.3d at 248 (quotation omitted). The "essential question" thus "asks whether [a municipality] could have chosen not to use [its] authority under the state statute and how [it] would use such authority; if [it] could have opted to act differently, or not to act," it may be held liable. *Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999) (citing, *inter alia*, *Bethesda Lutheran*, 154 F.3d at 718).

The State argues that since local government liability was not established in either *Bethesda Lutheran* or *Snyder*, the distinction between authorized and compelled municipal action described in the cases is "dicta." (State Br. at 42). This Court's explanation of its reasoning is hardly dicta. To the contrary, the cases recognize that *Monell* liability attaches if the municipal entity is independently responsible for the constitutional violation, *Snyder*, 745 F.3d at 247, as opposed to

acting at the command of the State, *Bethesda Lutheran*, 154 F.3d at 718.

There can be no doubt that, in deciding to enforce Indiana Code § 35-44.1-2-14 South Bend is acting independently. It has the has the authority to determine whether, when, and how to enforce Indiana Code § 35-44.1-2-14. That is, its actions are "made possible—but not dictated—by [the] statute." *Snyder*, 745 F.3d at 248. Thus, when its officers direct Mr. Nicodemus (or anyone else) not to "approach[] within twenty-five (25) feet," or when they set up successive 25-foot exclusion areas, they are not "acting under compulsion of state or federal law," *Bethesda Lutheran*, 154 F.3d at 718. In fact, as underscored previously, the unlimited discretion the statute affords law enforcement officers to determine when to utilize the statute is the very point of Mr. Nicodemus's First Amendment claim. Having made the discretionary decision to enforce a discretionary statute, South Bend may be held liable under *Monell* and its progeny.

## CONCLUSION

Indiana can certainly pass statutes that protect law enforcement personnel from interference while they are performing their duties. Indeed, it already has statutes that have this precise focus. However, Indiana Code § 35-44.1-2-14, has no focus. It contains no standards. Instead, it allows officers throughout Indiana to require persons to move back from police activity for any reason or no reason at all, denying the public the ability to see, hear, and record law enforcement activities. The statute is unconstitutional. The district court must therefore be reversed and this case remanded so judgment can be entered for plaintiff.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief conforms to Circuit Rule 32.

1.      This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 6,298 words based on the "Word Count" feature of Microsoft Word.

2.      This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font for the body of the brief and 11-point font for footnotes.

s/ *Kenneth J. Falk*
Attorney at Law